UNITED STATES of America, Plaintiff,

v.

The CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants,

and

San Francisco Firefighters Local 798, et al., Defendants in Intervention.

Fontaine DAVIS, et al., Plaintiffs in Intervention,

v.

The CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants,

and

San Francisco Firefighters Local 798, et al., Defendants in Intervention.

Nos. C-84-7089 MHP, C-84-1100 MHP.

United States District Court, N.D. California.

June 10, 1988.

Eva Jefferson Paterson, San Francisco Lawyers' Committee for Urban Affairs, William C. McNeill, III, Shauna I. Marshall, Equal Rights Advocates, Denise M. Hulett, Mexican–American Legal Defense & Education Fund, San Francisco, Cal., Russell Galloway, Berkeley, Cal., Mary Dunlap, Edwin M. Lee, William Tamayo, Michael J. Wong, Asian Law Caucus, Inc., San Francisco, Cal., for plaintiff-intervenors.

Duane W. Reno, Susanne L. Clerc, Davis, Reno & Courtney, San Francisco, Cal., for defendant-intervenor Local 798.

Robert T. Moore, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C.

Joann Swanson, Department of Justice, San Francisco, Cal.

Barbara Phillips, Monitor, Rosen & Phillips, San Francisco, Cal.

Dan Siegel, Chief of Complex Litigation, Office of the City Atty., San Francisco, Cal., for defendants City and County of San Francisco, et al.

## MEMORANDUM AND ORDER APPROVING CONSENT DECREE

PATEL, District Judge.

This employment discrimination action was originally brought by the United

States against the City and County of San Francisco ("the City") citing the illegal practices of the San Francisco Fire Department ("SFFD"). Various individuals and organizations have since intervened as plaintiffs [1] and San Francisco Firefighters Local 798 ("the Union") [2] has intervened as a defendant. After over four years of litigation, following a change in the political administration of the City which necessitated the postponement of trial, plaintiff-intervenors and the City reached a settlement of both the individual and the class-wide claims of discrimination against women and minorities and memorialized it in a proposed consent decree. The United States declined to participate in the negotiations leading to settlement. The Union, although it took part in settlement negotiations, objects to the terms of the decree and did not sign the agreement.

The case is now before the court for approval of the consent decree. Approval of the decree is opposed by the United States [3] and by the Union. The court has also considered the objections filed by members of the public in opposition to the provisions of the decree. In addition, a fairness hearing was held on December 22, 1987 at which counsel for all the parties argued the merits of the decree and the court entertained the statements of various firefighters both for and against the decree. Having considered the submissions of the parties and the objections filed with the court and raised at hearing, for the following reasons, the court approves the consent decree in settlement of all class-wide and individual claims for relief raised both in this action and in the concurrent state action, *City and County of San Francisco v. Fair Employment and Housing Commission [FEHC]*, No. A024145.[4] The Stipulation of Undisputed Facts [hereinafter "Stipulation"] filed August 15, 1986 and the Statement of Undisputed Facts [hereinafter "Facts"] filed November 12, 1987 are deemed facts found by the court and incorporated herein except as otherwise noted.

## BACKGROUND

The SFFD hired no Black firefighters before 1955,[5] allowed no women to apply before 1976 and hired no women until August 1987. Facts paras. 5, 2 and 1. It is unsurprising then that this action is not the first challenge faced by the City to the employment practices of the SFFD. This litigation must be understood in conjunction with an earlier federal suit, *Western Addition Community Organization [WACO] v. Alioto*, C 70–1335 WTS and a concurrent state action, *City and County*

---

1. Plaintiff-intervenors are: Fontaine Davis, Eric H. Washington, Jerilyn North, Robert L. Demmons, Jimmie Braden, Audry Lee, Early Davis, Brandi Swanson, Susan Moorehead, Anne Young, Mary M. Carder, Theresa Rodigou, Kathleen J. Bradshaw, Patricia Murray, Chinese for Affirmative Action (CAA) and the Mexican American Legal Defense Fund (MALDEF).

2. Because of the anomalous circumstance in the SFFD that all members of the department including those in supervisory ranks are members of the Union, the SFFD's interests are virtually indistinguishable from those of the Union.

3. The objections to the consent decree of the United States will be considered only insofar as they raise issues of conflict between the permanent injunctive relief awarded by the court in *United States v. City and County of San Francisco*, 656 F.Supp. 276, 289–92 (N.D.Cal.1987), and the terms of the decree. The government's claims in this action were completely resolved in that order and relief was granted.

The United States cannot waltz in and out of this action at will. Since the entry of the permanent injunction, the government has not actively participated in this case. Though invited, the government chose not to join in the negotiations for the consent decree. Accordingly, the government has no standing to object to the provisions of the decree except as they abridge or conflict with the rights granted the United States pursuant to the injunction. The government is deemed to have waived its right to object on any other basis.

4. See *infra*, Background Part II at 13. A representative of the FEHC appeared at the fairness hearing and informed the court that the FEHC had considered the terms of the decree, found it to be a fair way of resolving the discrimination in the SFFD past, present and future, and had voted to accept the terms of the decree in lieu of the relief it had ordered in 1982.

5. There are no records to indicate whether any Hispanic, Asian or Filipino firefighters were employed by the SFFD before Earl Gage, the City's first Black firefighter, was hired in 1955. The next Black firefighter was not hired until 1967. Facts para. 5.

of San Francisco v. Fair Employment and Housing Commission [FEHC], No. A024145.[6] The WACO suit challenged only the SFFD's entry-level hiring practices and only on grounds of racial discrimination. The FEHC suit challenged only promotional practices. The current litigation addresses both entry-level and promotional practices as well as problems of both gender and race discrimination in employment.

## I. Previous Federal Litigation: The Entry–Level Test

Although Blacks represented 14% of the City's population in 1970, of the 1800 uniformed firefighters employed by the SFFD only four were Black.[7] Western Addition Community Org. [WACO] v. Alioto, 330 F.Supp. 536, 538 (N.D.Cal.1971) [hereinafter "WACO I"]. That year the NAACP in concert with several community groups filed a class action suit[8] in this court against the City pursuant to the Civil Rights Act, 42 U.S.C. §§ 1981 and 1983,[9] to challenge the validity of the format used for the 1968 H2 entry-level firefighter test. WACO I, 330 F.Supp. at 537.

The 1968 H2 test determined eligibility for entry-level positions in the SFFD. The test comprised six components: physical measurement; athletic ability; medical examination; qualifications appraisal; employment, character and background check; and a written examination. Success on the first five components determined that an applicant was qualified. Only the written examination score determined an applicant's rank on the Civil Service list of eligibles. Id. at 538. According to Civil Service rule, hiring was by rank order from the eligibility list.[10] The WACO plaintiffs challenged only the written component of the 1968 H2 test.

The WACO plaintiffs charged that the 1968 H2 written exam had an adverse impact on minority applicants without having any relationship to the requirements of the job. See Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The results of the written portion of the 1968 H2 test were as follows:

| | Tested | Passed | Pass Rate |
| --- | --- | --- | --- |
| Total | 1883 | 662 | 35% |
| Black | 101 | 12 | 12% |
| Hispanic | 69 | 24 | 35% |
| Other [11] | 1713 | 626 | 37% |

See WACO I, 330 F.Supp. at 538; Facts para. 13. Thus, the pass rate for Black applicants on the 1968 H2 written exam was about one-third that of White applicants. Facts para. 13.

In 1971 Judge Sweigert found that the plaintiffs had demonstrated that the 1968

---

**6.** This court may take judicial notice of and consider the record in both the WACO and FEHC litigations regarding the discriminatory practices of the City. See United States v. City and County of San Francisco, 656 F.Supp. 276, 285 n. 9 (N.D.Cal.1987); In re A.H. Robbins Co., 107 F.R.D. 2, 12 (D.Kan.1985).

**7.** By 1973, although minority representation on the SFFD remained largely the same, minority representation was up to 65% in the City's high schools. See Western Addition Community Group [WACO] v. Alioto, 369 F.Supp. 77, 79 n. 1 (N.D.Cal.1973), appeal dismissed as moot, 514 F.2d 542 (9th Cir.), cert. denied, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975).

**8.** Although the court certified the class only for purposes of settlement, the action proceeded as a class action.

**9.** The provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., did not become applicable to public employers until 1972. Johnson v. Transportation Agency, 480 U.S. 616, —— n. 6, 107 S.Ct. 1442, 1449–50 n. 6,

94 L.Ed.2d 615 (1987). Thus, the WACO suit was originally brought on equal protection grounds.

**10.** Each eligibility list had an expiration date so that not all applicants who qualified and made the list had a reasonable hope of being hired. Generally, the list expired before it was exhausted. Thus the written exam, which established ranking, was the most significant portion of the test.

**11.** This figure was assumed both by Judge Sweigert, see WACO I, 330 F.Supp. at 538; Western Addition Community Group [WACO] v. Alioto, 340 F.Supp. 1351, 1352 (N.D.Cal.1972), and the parties to the proposed consent decree, see Facts para. 13, to represent the number of White applicants who took and passed the 1968 H2 test's written exam. This figure probably also represents Asian and Filipino applicants. The record, however, demonstrates a historical pattern of extremely low representation of these minorities in the applicant pool such that the failure to separate representation of these groups is unlikely to skew the numbers greatly for purposes of comparison.

H2 test had an adverse impact on minorities and that the City had failed to carry its burden to show any connection between the qualities tested on the written exam and the job requirements of an entry-level firefighter.[12] *WACO I*, 330 F.Supp. at 539–40. In defense of the exam, the City responded only that the SFFD had made efforts to recruit minority applicants for the 1968 H2 test. The court ruled that "whatever may have been the good intentions of defendants, there is a prima facie case for predicating employment discrimination." *Id.* at 539.[13]

A revised H2 entry-level test was administered in September 1971. The 1971 H2 test comprised three parts given in two stages. The first stage required the applicant to pass a written examination by answering 90 out of 130 questions correctly. If the applicant passed the written exam, he then had to pass an athletic ability exam and an oral exam. The results of the second stage exams determined an applicant's rank on the eligibility list. *Western Addition Community Org. [WACO] v. Alioto,* 340 F.Supp. 1351, 1352 (N.D.Cal.1972) [hereinafter *"WACO II"*]. The *WACO* plaintiffs again came before the court in 1972 seeking to enjoin, on the grounds of adverse impact, the use of the resulting eligibility list. The results of the written portion of the 1971 H2 test were as follows:

| | Tested | Passed | Pass Rate |
|---|---|---|---|
| Total | 1741 | 831 | 48% |
| White | 1187 | 676 | 57% |
| Black | 333 | 67 | 20% |
| Hispanic/Asian | 221 | 88 | 40% |

*WACO II*, 340 F.Supp. at 1353. Thus, instead of eliminating adverse impact, the 1971 H2 test only perpetuated the 1968 H2 test's approximately three-to-one passing advantage of White over Black applicants.

The court held that the 1971 H2 entry-level test had an adverse impact on minority applicants and was not shown to be job-related. Specifically, the court found that the City was unable to validate [14] the 1971 H2 test because it had not, in the first instance, conducted a job analysis. Because there was no way of knowing what the job required, there was no way to determine whether the test was reasonably related to job requirements. *See WACO II*, 340 F.Supp. at 1356. After noting that the City's own experts had "virtually confessed" that validation was impossible and affirming the City's good intentions while bemoaning its failure "to comply with the fairly well-established requirements of the law in this field," the court enjoined the use of the 1971 H2 entry-level firefighters exam and the resulting eligibility list. *WACO II*, 340 F.Supp. at 1356; Facts para. 14.

In 1973 the City presented the court with a new written test, which it claimed to have properly validated. The court found that although the City had conducted a job analysis substantially in accordance with federal guidelines, it had failed entirely to validate the written test empirically (as required by the guidelines if feasible) and further that it had not shown the adequacy of the attempted content validation. *Western Addition Community Org. [WACO] v. Alioto*, 360 F.Supp. 733, 739 (N.D.Cal.1973) [hereinafter *"WACO III"*]. Judge Sweigert refused to approve the written exam and issued the following admonishment to the City:

> The time has come—especially after the City has twice failed to satisfactorily demonstrate the validity of its Fireman H–2 written examination tests—for the City to seriously, rather than superficially and speciously, face up to the problem

**12.** The 1968 H2 written exam tested for knowledge of mathematics, verbal skills, and reading comprehension (47%); mechanics (16%); basic chemistry and physics (11%); situational responses (13%); and basic first aid and bodily functions (13%). *WACO I*, 330 F.Supp. at 539.

**13.** The court declined, however, to enjoin preliminarily the further use of the 1968 H2 test format in the belief that modifications proposed by a Civil Service Task Force and filed with the

court would eliminate any grounds for controversy. *WACO I*, 330 F.Supp. at 540 and Appendix.

**14.** Validation is the process of demonstrating that a test which is shown to have an adverse impact is nevertheless significantly related to on-the-job performance. For an explanation of different types of validation, see *WACO II*, 340 F.Supp. at 1354–55.

presented to it by new federal law by further efforts to rebut or correct the already legally established *presumptive* discriminatory effect of its selection procedures.

*WACO III*, 360 F.Supp. at 739 (emphasis in original). The court declined at that time to order affirmative race-conscious relief. It did order, however, that the written portion of the proposed test not be used for cut-off or ranking purposes and also ordered the City to proceed apace to validate empirically either the test under consideration or a new test. *WACO III*, 360 F.Supp. at 740–41.

In June 1973, the *WACO* plaintiffs moved for and were granted affirmative relief. *Western Addition Community Org. [WACO] v. Alioto*, 369 F.Supp. 77 (N.D.Cal.1973) [hereinafter *"WACO IV"*], *appeal dismissed as moot*, 514 F.2d 542 (9th Cir.) (per curiam), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). The court found that the City had failed three times to demonstrate that the challenged H2 tests were job-related. The appropriate remedy for such repeated failures to comply with the law and with court orders was affirmative relief "even though it cannot be established that the discriminatory practices were intentional or invidious." *WACO IV*, 369 F.Supp. at 79.

The court directed its exasperation at the City's Civil Service Commission ("the Commission"), pointing out that the Commission's failure to comply with the order in *WACO III* had resulted in the SFFD being over eleven percent understaffed.

The Commission's dilatoriness in these matters and apparent stubborn insistence upon arguments and alternatives which this court has repeatedly found unacceptable, have created an intolerable situation; the adequacy of Fire Department manpower for the safety of the City is coming into question; all Fireman H–2 applicants, both minority and non-minority, have been kept in a state of uncertainty for several years and the rights of minority applicants to a more prompt cor-

rection of the City's still unvalidated selection procedures are involved.

*WACO IV*, 369 F.Supp. at 80. Judge Sweigert ordered one-for-one White to minority hiring from the 1973 H2 list (identified as list E–25), regardless of rank, until the list of qualified minority applicants (consisting of those who had answered at least 50 of the 100 questions on the written exam correctly and passed the oral and athletic tests) was exhausted. *Id.* at 80–81; Facts para. 27.

In early 1974, the SFFD substantially modified the ongoing evaluation of participants at the Fire College. The Fire College, established in 1957, provides several weeks of required training and practical instruction to newly appointed H2 firefighters. Between 1957 and 1972, only two firefighters were ever dismissed based on inadequate performance at the Fire College. In 1974, however, the Fire College program was revised to include weekly testing of ability to manipulate fire equipment and a procedure was instituted for dismissal of those who failed the program. Stipulation paras. 56–61.

The *WACO* litigation was terminated by consent decree in May 1977. Facts para. 31. The decree was to be in effect for five years.[15] The decree reiterated the court's earlier finding that the plaintiffs had made out a prima facie case of race and national origin discrimination. In addition, the decree noted the court's finding that the City had failed to carry its burden to explain the disparate impact of its selection procedures upon minority applicants. *See Western Addition Community Org. [WACO] v. Alioto*, No. C–70–1335 WTS, slip op. at 2 (N.D.Cal. May 18, 1977) [hereinafter *"WACO V"*]. The decree established guidelines for the use of exam components from the newly announced (1976) H2 test. It included no provision for affirmative relief on the grounds that "[i]n view of the agreement of the parties and the defendants' efforts of improving the selection process for entry-level firefighter, there is no need for nor would it be appropriate to impose a further ratio or quota hiring order

**15.** The parties to the instant action have agreed that the *WACO* consent decree expired in 1982.

upon defendants." *WACO V*, slip op. at 9. The decree did state as a goal of the parties, however, that the H2 eligible list should reflect 40% minority representation. *Id.* at 9–10.

The 1976 H2 test used the 1973 written exam with a cut-off score of 70% and a weight of 40% in ranking for the eligibility list. In addition, applicants were required to pass a physical agility test ("PAT") that was weighted 60% in ranking. According to Civil Service rule, appointments from the resulting list of eligibles (list E–26) were to be made in rank order. Facts para. 30. The pass rates for the written portion of the 1976 H2 test were as follows:

| | Tested | Passed | Pass Rate |
|---|---|---|---|
| Total | 3386 | 2642 | 78% |
| White | 1995 | 1761 | 88% |
| Black | 562 | 306 | 54% |
| Hispanic | 462 | 319 | 69% |
| Asian | 289 | 202 | 70% |
| Am. Ind./Other | 78 | 54 | 69% |

*See* Facts para. 32. The rate of Black to White applicants passing the 1976 H2 test was 61%, the rate of Hispanic to White applicants passing the test was 78% and the rate of Asian to White applicants passing the test was 80%.

In 1978, the *WACO* plaintiffs raised an objection to the use of the 1976 test. Judge Sweigert rejected their objection because the City had comported with the express terms of the consent decree. *See Western Addition Community Org. [WACO] v. Alioto,* No. C–70–1335 WTS, slip op. at 2 (N.D.Cal. June 9, 1978) [hereinafter *"WACO VI"*].

As of November 1987, fourteen years after Judge Sweigert's 1973 order granting affirmative relief and ten years after the entry of the *WACO* consent decree, over 55% of the minority firefighters working in the SFFD had been hired pursuant to Judge Sweigert's 1973 order. Facts para. 28.

Thus, while the *WACO* consent decree ameliorated some of the disparate impact on minorities of the SFFD's entry-level hiring practices, it was by no means a complete resolution. It is therefore no surprise that the City has since had to defend the hiring and promotional practices of the SFFD before both state and federal courts.

II. *Prior State Court Litigation: The Promotional Test*

All positions above the rank of H2 firefighter (except that of Chief) are filled by promotion from within the SFFD.[16] Of the 352 permanent supervisory positions in the SFFD, none are held by women, none are held by Asians, four (1%) are held by Blacks and 16 (5%) are held by Hispanics. Only one member of a minority group holds a rank above captain. *See* Facts paras. 7–9.

The first rank in the SFFD above H2 entry-level firefighter is H20 fire lieutenant. Before 1982, the H20 test for promotion to the rank of lieutenant consisted solely of a written job knowledge exam. Facts para. 33. The 1978 lieutenant's exam tested for knowledge of firefighting strategy and technique, arson detection, equipment maintenance, rescue and emergency medical procedures, and report writing. *See City and County of San Francisco v. Fair Employment and Housing Comm'n [FEHC],* 191 Cal.App.3d 976, 980–81, 236 Cal.Rptr. 716 (1987) [hereinafter *"FEHC"*]. Rank on the eligibility list (which listed only the top 250 applicants[17]) was determined by a combination of an applicant's score on the written exam, his seniority, his record of meritorious service and his "clean record" points. Facts para. 33. For the 1978 H20 test, an applicant's score on the written exam counted 88% and the remaining factors counted 12% in determining rank on the eligibility list. Facts para. 34. The results of the 1978 H20 test for fire lieutenant were as follows:

---

**16.** This entirely internal promotion procedure is enforced by a time in grade requirement. That is, to be eligible for any rank above H2 firefighter, the applicant must have completed a probationary period in the ranks below. Stipulation at paras. 51, 52.

**17.** Of the 250 on the list of eligibles, however, only the top 160 had a chance of promotion during the four years before the list expired. *FEHC,* 191 Cal.App.3d at 981 n. 3, 236 Cal.Rptr. 716.

| | Tested | Passed | Pass Rate | Aptd | Apmt Rate[18] |
|---|---|---|---|---|---|
| Total | 577 | 250 | 43% | 153 | 27% |
| White | 473 | 226 | 48% | 140 | 30% |
| Black | 34 | 6 | 18% | 3 | 9% |
| Hispanic | 54 | 17 | 31% | 10 | 19% |
| Asian/Other | 16 | 1 | 6% | 0 | 0% |

*See* Facts para. 35.[19] Thus, the ratio of the pass rate of the minority subgroup to the pass rate of White firefighters on the 1978 H20 test was 38% for Black firefighters, for Hispanic firefighters it was 65% and for Asian/Other firefighters it was 13%.

Between June and September of 1980, Black firefighters filed ten complaints with the California Department of Fair Employment and Housing ("the Department") alleging that the SFFD's 1978 H20 test discriminated on the basis of race. Facts para. 36. The Department issued a formal complaint and an administrative hearing ensued. *FEHC,* 191 Cal.App.3d at 981, 236 Cal.Rptr. 716. The Fair Employment and Housing Commission ("the FEHC")[20] determined on the basis of the hearing record that the 1978 H20 test had an adverse impact on minority applicants and that the City had failed to show that the test was sufficiently job-related to be valid.[21] *Id.* at 982, 236 Cal.Rptr. 716. Although the City obtained a writ of administrative mandamus from a California superior court vacating the decision of the FEHC, the Court of Appeal subsequently concluded that the FEHC's findings were supported by substantial evidence and reversed the superior court's judgment. *Id.* at 982, 990, 994, 236

Cal.Rptr. 716. The decision of the Court of Appeal became final and this court has held that the decision has preclusive effect in this litigation.[22] Order of May 25, 1988 (confirming bench order of October 21, 1987).

The Court of Appeal held that the Department had established a prima facie case of discrimination by demonstrating a significant disparity between the passing rates of White and Black applicants. The significance of the disparity in passing rates was determined by reference to the Uniform Guidelines on Employee Selection Procedures ("the Uniform Guidelines"), 29 C.F.R. § 1607.1 et seq.[23] *FEHC,* 191 Cal. App.3d at 986–87, 236 Cal.Rptr. 716. The rule of thumb under the Uniform Guidelines provides that a selection rate (among minority applicants) of less than 80% of the rate of the group with the highest selection rate (usually White applicants) is considered to be strong evidence of adverse impact. 29 C.F.R. § 1607.4(D). The 38% passage rate of Black as compared with White firefighters on the 1978 H20 test was obviously far below the 80% rate suggested by the Uniform Guidelines. The Court of Appeals found the likelihood that the adverse impact was happenstance to be slight. *FEHC,* 191 Cal.App.3d at 987, 236 Cal.Rptr. 716.

The court rejected the arguments raised by the City to account for the disparity in passing rates. First the City argued that

18. Appointment rate is the percentage appointed of all those tested, rather than the percentage appointed of only those who passed the test.

19. The parties' stipulated facts isolate the numbers of minorities differently than did the California Court of Appeal. The differences are not significant. See *FEHC,* 191 Cal.App.3d at 981, 236 Cal.Rptr. 716.

20. The Department prosecutes cases and the FEHC adjudicates them. *FEHC,* 191 Cal.App.3d at 981 n. 4, 236 Cal.Rptr. 716.

21. The FEHC enjoined the City from promoting from the 1978 H20 list of eligibles; ordered the immediate promotion with back pay of four Black firefighters; ordered the promotion of six more Black firefighters within one year; and ordered the promotion of one Black for every five non-Black promotions until the City arrived

at and administered a job-related promotional H20 test. *FEHC,* 191 Cal.App.3d at 982, 236 Cal.Rptr. 716. The Court of Appeal, however, vacated this portion of the FEHC's order and deferred the award of relief to this court in order to avoid the possibility of inconsistent awards of relief. *Id.* at 992–94, 236 Cal.Rptr. 716.

22. Analysis of disparate impact under the California Fair Employment and Housing Act is identical to Title VII analysis and Title VII analysis was in fact employed by the Court of Appeal in *FEHC. FEHC,* 191 Cal. App.3d at 985–86, 236 Cal.Rptr. 716.

23. The Uniform Guidelines were jointly adopted in 1978 by the Equal Employment Opportunity Commission, the Civil Service Commission, the Department of Labor and the Department of Justice. 29 C.F.R. § 1607.1(A).

job experience rather than race accounted for most of the disparity in passage rates of Black and White applicants. The court found that the Department's statisticians had accounted for differences in seniority, service as a temporary lieutenant and prior simulator training experience only to find that these factors could not explain the disparity in passing rates. *FEHC,* 191 Cal. App.3d at 988–89, 236 Cal.Rptr. 716. The City also tried to argue that the Black applicants were less capable than their White counterparts because 73% of them had been hired pursuant to the *WACO IV* hiring order. See 369 F.Supp. at 81. The court found that this argument was not only without factual support, it was in fact contradicted by evidence that all the applicants were highly experienced and had demonstrated success by surviving a stringent training program. *FEHC,* 191 Cal. App.3d at 989, 236 Cal.Rptr. 716. Finally, the court dismissed the City's argument that the Black candidates had failed to prepare adequately for the test. *Id.*

Once the court determined that there was substantial evidence to support the FEHC's finding of adverse impact, it turned to the question of whether the City had demonstrated that the test was job-related. It concluded that there was substantial evidence to support the FEHC's findings that the 1978 H20 test was unrelated to the job and wholly unvalidated. *Id.* at 990, 236 Cal.Rptr. 716. The FEHC had found that although supervision was the primary component of the fire lieutenant's job, ability to supervise was nowhere listed in the job description, nor was it tested for in the 1978 H20 test. The City had presented no evidence demonstrating a correlation between higher test scores and job performance. *Id.* The Court of Appeal pointed out that such empirical validation could have been obtained easily because many of the questions on the 1978 H20 test had been taken from earlier H20 tests. *Id.*

at 990–91, 236 Cal.Rptr. 716. The FEHC concluded that written tests are an inappropriate measure of supervisory skills and the Court of Appeal agreed. *Id.* at 990, 236 Cal.Rptr. 716.

Recognizing the overlap between the state case and this litigation, the Court of Appeal sought to avoid the possibility of inconsistent awards and so vacated the relief ordered by the FEHC [24] and deferred relief pending the outcome of this litigation. *Id.* at 944, 236 Cal.Rptr. 716.

### III. *Current Litigation: The H2, H20 and H4 Tests*

All regular entry-level hiring in the SFFD between the time of the termination of the *WACO* litigation and the filing of this action was carried out pursuant to lists E–25 and E–26, under the supervision of the *WACO* court.[25] Facts paras. 18, 27, 31; *WACO V,* slip op. at 10.

The SFFD administered a new H2 entry-level test in 1982–83, and a new H20 fire lieutenant promotional test in 1984. Also in 1984, the SFFD administered an H4 fire inspector promotional test. After the results of the 1982–83 H2 test were published, the United States and plaintiff-intervenors brought separate suits in this court under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 6701 et seq., for the City's failure to correct the effects of past discrimination and for its continued use of invalid hiring procedures that had an adverse impact on women and minorities. The United States sought relief for Black, Asian and Hispanic applicants. The plaintiff-intervenors sued on behalf of women and Blacks and added claims for racial harassment. Subsequently, Asian and Hispanic intervenors joined the action. In addition, there were individual claims for relief. The cases were consolidated in 1986.

---

**24.** See *supra,* note 21.

**25.** In addition to the SFFD's regular hiring, there was hiring from list P–1. This list was generated for the Fireman Safety Technician Program, a temporary, special, federally funded

program outside the normal Civil Service channels which was designed to prepare minority applicants to pass the H2 firefighter test. *See WACO III,* 360 F.Supp. at 735 n. 4; Facts para. 19.

The consolidated complaints focused on current hiring practices, specifically on the adverse impact of the 1982–83 H2 test for entry-level firefighter, the 1984 H20 test for promotion to fire lieutenant and the 1984 H4 test for promotion to fire inspector. The plaintiff-intervenors also focused on charges of racial harassment. In February 1986 this court preliminarily enjoined the City from hiring from the E–27 list generated by the 1982–83 H2 test. *See* Order of February 12, 1986 at 15.

The 1982–83 H2 test consisted of a written exam and a physical agility test ("PAT"). The passing score on the written test was 60%. The written portion was to count 30% and the PAT was to count 70% toward ranking. After this suit was filed, the City re-weighted the test, considering the written exam only as qualifying test without ranking weight and giving the PAT 100% weight as a ranking device. Facts para. 45. The E–27 list consisted of 190 applicants in rank order. Facts para. 44. The results of the 1982–83 H2 written exam were as follows:

| | Tested | Passed | Pass Rate |
|---|---|---|---|
| Total [26] | 3376 | 2641 | 78% |
| White | 1803 | 1668 | 93% |
| Black | 681 | 377 | 55% |
| Hispanic | 463 | 320 | 69% |
| Asian | 393 | 250 | 64% |

*See* Facts para. 47. The passing rate on the 1982–83 H2 written exam for Black applicants was 59%, for Hispanic applicants was 74% and for Asian applicants was 69% of the passing rate for White applicants.

Only those who passed the written test were permitted to take the PAT test. The results of the 1982–83 H2 PAT test were as follows:

| | Tested | Passed | Pass Rate |
|---|---|---|---|
| Total [27] | 2061 | 1286 | 62% |
| White | 1332 | 886 | 67% |
| Black | 282 | 173 | 61% |
| Hispanic | 245 | 138 | 56% |
| Asian | 183 | 89 | 49% |
| Women | 79 | 18 | 23% |
| Men | 1982 | 1268 | 64% |

*See* Facts para. 48. Compared with White applicants, the passing rate on the 1982–83 H2 PAT for Black applicants was 91%, for Hispanic applicants was 84% and for Asian applicants was 73%. The passing rate for women was 36% of that for men.[28] Of the top 190 scorers, however, which were the applicants certified to the eligibility list, 66% (125) were White, 19% (36) were Black, 5% (9) were Hispanic, 8% (15) were Asian and none were women. Facts para. 49.

In June 1986 this court granted partial summary judgment on the claims that the 1982–83 H2 written exam adversely impacted Blacks and that the 1982–83 H2 PAT adversely impacted women. *See* Order of June 23, 1986 at 8–9.

On the eve of trial in October 1986, the City declared that it would not defend the validity of the H2, H20 and H4 tests. Later that month the Commission cancelled the H2 and H20 tests along with all eligibility lists. In early November the Commission did the same with respect to the H4 test. In response to the City's withdrawal of the tests and its decision to give up defending their validity, the United States and plaintiff-intervenors moved for summary judgment.

In February 1987 the court granted plaintiffs' motion for summary judgment,

---

**26.** The parties stipulated that 7273 people *applied* for the position of H2 firefighter in 1983, but that only 3376 actually took the 1982–83 H2 test. *Compare* Facts para. 43 *with* Facts para. 47. The discrepancy is unaccounted for. Whatever its cause, the result of the 46% attrition rate was to reduce the overall representation of minority applicants in the pool. For instance, the representation of Blacks in the applicant pool fell from 28% (2034 applicants out of a pool of 7273) to 20% (681 applicants out of a pool of 3376). *Id.*

**27.** There is a discrepancy between the total number of applicants who passed the 1982–83

H2 written exam and thus were qualified to take the PAT and the total number that took the PAT. The parties stipulate that 2641 applicants passed the written exam, but that only 2061 went on to take the PAT. *Compare* Facts para. 47 *with* Facts para. 48. No attempt was made to account for this difference. Again, the most obvious effect of the attrition was to reduce minority representation.

**28.** The parties calculated incorrect figures for comparative pass rates and the court declines to adopt them. See Facts para. 48.

issued a permanent injunction and provided for interim hiring. See *United States v. City and County of San Francisco*, 656 F.Supp. 276 (N.D.Cal.1987) [hereinafter *"Davis I"*]. The court found, in light of the City's admissions, that "the H2, H4, and the H20 selection and promotion procedures fall within the definition of employment practices proscribed by Title VII. These facts clearly establish a prima facie violation of law...." *Davis I*, 656 F.Supp. at 282.

Further, the court determined that the City's withdrawal of the H2, H20 and H4 tests did not bar the award of injunctive relief, "particularly ... in light of the City's plans to immediately develop a new series of hiring and promotional examinations. Given the City's historical inability to develop valid employment procedures, the possibility of future violations must be precluded by assuring that the City's new examinations finally satisfy the requirements of Title VII." *Id.* at 287 n. 14. The court rejected the argument that by withdrawing the challenged tests, the City had "immunized itself from the future use of discriminatory hiring practices." *Id.* at 287.

> [T]he City has only deepened cause for concern by conceding that it has failed once again to develop valid employment procedures for hiring and promotions within the Fire Department, thus adding yet another chapter to an unenviable record of behavior reaching back nearly two decades. For the court to ignore the SFFD's consistent and ongoing inability to utilize nondiscriminatory employment procedures, and to decline to enter judgment and award injunctive relief to assure that this sorry history will finally come to an end, would be inexcusable.

*Id.* The court then issued a permanent injunction, large portions of which have been incorporated in the consent decree. *Compare Davis I.* 656 F.Supp. at 289–292 *with* Consent Decree Ex. A. The injunction, which remains in effect for five years, prohibits violations of Title VII by the SFFD or its toleration of such violations by its employees; requires the institution of recruitment and training programs; re-

quires new test development according to the Uniform Guidelines; sets out a schedule for test development deadlines; requires semiannual progress reports to the court; and requires record keeping. *Davis I*, 656 F.Supp. at 289–92.

Finally, pending the development of a new H2 entry-level firefighter test, the court provided for provisional interim hiring to avoid a staffing emergency that might endanger the public welfare. *Id.* at 292–93.

With one exception, this court never received evidence or made any findings with respect to plaintiff-intervenors' charges of racial harassment. The City and plaintiff-intervenors, however, have stipulated that the SFFD's procedure for handling charges of racial harassment is different from that used for other rules violations. Facts para. 54. In addition, the parties stipulated that prior to October 1986 only two White firefighters had ever been suspended as a result of a complaint of racial harassment filed by a Black firefighter. Facts para. 55.

Although no evidence was ever received at a full trial regarding plaintiff-intervenors' charges of racial harassment, the court did on one occasion receive sworn testimony regarding incidents of racial harassment. In January 1988 plaintiff-intervenors moved the court to find the City in contempt of court for failing to comply with the term of the permanent injunction forbidding racial harassment. See *Davis I*, 656 F.Supp. at 289–90 (permanent injunctive relief para. 1). Specifically, the City was charged with failing to investigate or punish members of the SFFD for incidents of racial harassment and encouraging harassment of minorities by maintaining an attitude of tolerance toward such incidents. The catalyst for the motion was widely reported incident in which two minority firefighters (one Asian and one Black) returned to their firehouse desks to find a swastika hanging from a nearby wall.

At the court's request, the court-appointed monitor filed under seal a report on the swastika incident as well as other recently

reported incidents of racial harassment.[29] Before the hearing on the contempt motion, the report was made available only to the court, counsel for the City and plaintiff-intervenors, and the Chief.

The SFFD's Chief Edward Phipps[30] testified at a hearing on the motion on January 14, 1988. In response to questioning by attorneys for plaintiff-intervenors, the City and the Union, as well as by the court, Chief Phipps explained the procedure for dealing with charges of harassment and testified that it was his duty to investigate charges of discrimination and racial harassment. The Chief admitted, however, that he was unfamiliar with both the SFFD's internal reports and the report of the monitor regarding the incidents in question. Further, the Chief said that although he had the power to suspend immediately, he had never done so, preferring to counsel firefighters regarding their behavior and wait for an official report. The Chief admitted that the SFFD had not committed sufficient resources to enable it to investigate quickly and punish charges of racial harassment. The Chief could not recall whether he had ever imposed discipline in response to a racial grievance. The Chief admitted he had heard reports that members of the SFFD had taken up collections and compensated firefighters suspended for disciplinary infractions. He could not say whether storing as opposed to displaying a swastika in a firehouse would warrant disciplinary action. Finally, the Chief expressed less concern about the posting of a racially inflammatory letter at one of the firehouses than about whether it was written on-duty or off-duty.

The court found that with respect to the treatment of minority members, the SFFD was "out of control." Further, the court found that the SFFD was clearly lacking either the willingness or the ability to carry out the court's injunction and the SFFD's internal order prohibiting racial harassment.[31] The court found that the delays in investigating charges of harassment suggested an atmosphere of toleration for such incidents.

The court issued an injunction which holds all members of the SFFD above the rank of lieutenant personally responsible for implementation of the SFFD's anti-harassment policy as embodied in its General Order of October 1987 and as incorporated in the court's order. *See* Order filed February 5, 1988 [hereinafter *"Davis II"*], notice of appeal filed March 7, 1988. The court ordered these persons to ensure, within ten days, that each firehouse under their supervision was inspected and that all racially or sexually inflammatory materials were removed and destroyed. *Davis II,* slip op. at 4. Failure to comply with provisions of the order will subject these supervisors to a finding of contempt and the imposition of a fine or imprisonment or both. *Id.* The order also provides specific time limits for processing and acting on complaints of harassment. *Id.* at 4–5. Finally, the order provides that no person disciplined by the SFFD shall be reimbursed for any resulting loss of pay. *Id.* at 5. The injunction is to remain in effect until this court orders otherwise upon determining that the SFFD has shown that it is taking responsibility for compliance with the civil rights laws as seriously as its firefighting responsibilities.

THE CONSENT DECREE

The consent decree, filed with the court on November 12, 1987, is attached as Appendix A to this order and will not be detailed here. For purposes of discussion, however, it will be helpful to outline briefly its broad provisions.

29. These incidents included the posting of a racially inflammatory letter, which was authored by an aide to one of the deputy chiefs, on the bulletin board of a firehouse; an assault on the SFFD's chief in charge of training by some off-duty members of the SFFD for helping women train to be firefighters; and the removal of the image of the only Black firefighter in a photograph of SFFD honorees.

30. Chief Phipps resigned his position a few days after the hearing in the matter of the swastika. In March 1988, Mayor Agnos announced the appointment of Chief Postel.

31. The SFFD had adopted an anti-discrimination order in October 1987.

The stated purpose of the consent decree is "to eradicate the present effects of past employment practices with respect to minorities and women." Consent Decree ("C.D.") at 8.

The consent decree satisfies all claims of private plaintiffs and plaintiff-intervenors brought in this action. *Id.* at 5.

The decree incorporates, as modified by the parties, relevant portions of the injunctive relief awarded by this court in *Davis I.* C.D. at 6 and Ex. A.

The decree provides that the City shall continue to require that all applicants for the position of H2 entry-level firefighter be bona fide residents of the City and County of San Francisco at the time of and for a period of four months prior to the time of their application and through the date of their appointment. The parties specify that the City and County of San Francisco is the relevant geographic labor market. *Id.* at 6.

The decree provides for the constitution of and specifies the powers and duties of a test development committee. *Id.* at 7.

The decree sets out long term hiring goals of 40% minority and 10% female representation. Such goals are made subject to the availability of qualified applicants. To help assure a pool more accurately reflective of female and minority representation in the community served, the consent decree provides for specific recruitment efforts. *Id.* at 8–9. Failure to meet a goal cannot be justified on the basis of an approved test unless the test comports with the Uniform Guidelines on Employee Selection Procedures and is shown to eliminate or minimize adverse impact consistent with those guidelines. *Id.* at 8.

The provisional firefighters hired pursuant to *Davis I* are to be given a special test no later than October 1, 1988. Those who pass will receive permanent appointments retroactive to their hiring date. C.D. at 9.

All hiring goals are targets. Failure to meet a goal must be justified to the court.

The goals presuppose hiring of 500 new firefighters over the life of the consent decree. Of the 10% goal for women in entry-level hiring, at least 50% should be minority women, and a higher goal may be imposed should there be sufficient qualified candidates. The decree imposes a 55% goal for minorities in entry-level hiring. The minimum goal for each minority group protected by the decree will be the percentage reflected in the 1980 and 1990 census. Currently these percentages are: 19% Asian, 10% Black and 11% Hispanic. If the City decides to test less than all those who apply, the testing pool must reflect the applicant pool and be selected at random. *Id.* at 10–11.

To remedy adverse impact in promotions the decree makes several provisions. First, six named Black provisional lieutenants [32] will be promoted to permanent lieutenant retroactive to March 9, 1979 with back pay. A special H30 test for promotion to captain will be given to these six by April 1, 1988. The results of this exam are to be integrated with the existing captain's list. Those who fall within the range of those already promoted will be immediately promoted. The others will remain on the list until in the regular course they are promoted or the list expires. *Id.* at 11–12.

Second, the goal for promotions is that they come to reflect minority representation in the applicant pool. The applicant pool for promotions is defined as those who both are eligible and apply. *Id.* at 12.

Third, the consent decree sets out a fairly complicated schedule for the administration of promotional tests designed to insure that there is an increasing number of minority and female applicants in the promotional pool. All eligibility lists are to expire after two years. *Id.* at 13–15. The consent decree sets up a special procedure for grieving tests and selection procedures. *Id.* at 15–16.

Finally, the consent decree provides that within 60 days of execution by all parties, the SFFD shall promote (in addition to the

---

**32.** The named provisional lieutenants are: Demmons, Lee, Braden, Brooks, Rockett and Wangara.

six provisional lieutenants earlier named) 11 Black firefighters, 8 Hispanic firefighters and 8 Asian or Filipino firefighters from the 1984 H20 list to the position of fire lieutenant. The SFFD may also promote an additional 48 lieutenants from the 1984 H20 list. Of those promoted, 25% shall be minorities. If the SFFD promotes all 48 allowed, 5 shall be Black, 5 shall be Hispanic and 2 shall be Asian or Filipino. No one found by the court to have violated federal civil rights laws shall be promoted pursuant to these provisions of the consent decree.[33] *Id.* at 16–17.

The consent decree provides for human relations training. *Id.* at 17. It also provides a specific process for grieving human relations charges. *Id.* at 18–20.

The consent decree provides for the appointment and sets out the powers and responsibilities of a monitor who will insure compliance with the decree. *Id.* at 20–21.

The decree does not dispose of claims for attorneys' fees. *Id.*

The consent decree shall be in effect for seven years. *Id.* at 22.

LEGAL STANDARD

Voluntary compliance is the preferred means of achieving the objectives of equal employment opportunity embodied in Title VII. *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir.1982), *cert. denied*, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). *See Johnson v. Transportation Agency*, 480 U.S. 616, ——, 107 S.Ct. 1442, 1457, 94 L.Ed.2d 615 (1987); *Kirkland v. New York State Dep't of Correctional Servs.*, 711 F.2d 1117, 1128 (2d Cir.1983) ("voluntary compromises of Title VII actions enjoy a presumption of validity"), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984). There are several reasons for the preferred status accorded amicable settlements of litigation and plans voluntarily undertaken by employers in the absence of litigation. In addition to reasons of judicial economy and the savings of the costs of litigation, volun-

tary action may produce more favorable results because it is less likely than a court order to engender opposition and resentment. *Kirkland*, 711 F.2d at 1128 n. 14. Further, "[t]he value of voluntary compliance is doubly important when it is a public employer that acts, both because of the example its voluntary assumption of responsibility sets and because the remediation of governmental discrimination is of unique importance." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 290, 106 S.Ct. 1842, 1855, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring).

With the hope that this settlement will end the need for the court's intervention and allow the SFFD to set about healing the wounds inflicted over long years of discrimination and during the course of this litigation, the court will review the terms of the consent decree not only for the fairness of its terms, but also to insure its statutory and constitutional validity. The standards for evaluating fairness and validity are discussed below.

*I. The Standard of Review for Fairness*

A class action cannot be compromised or settled without court approval. Fed.R.Civ.P. 23(e); *Officers for Justice*, 688 F.2d at 623. Thus, the first standard by which the court must evaluate the settlement reached by the parties in this case is whether the terms of the consent decree are fundamentally fair, adequate and reasonable. *See Officers for Justice*, 688 F.2d at 625. This determination should be reached by focusing primarily on the terms of the decree. *See Moore v. City of San Jose*, 615 F.2d 1265, 1271 (9th Cir.1980). In determining whether the settlement is fair, however, the court should also consider an amalgam of factors including but not limited to: the strength of the plaintiffs' case; the risk, expense, complexity and likely duration of further litigation; the extent of discovery and stage of the proceedings; the experience and views of counsel; the

---

**33.** A letter from the City and its response to the objections to the Consent Decree set out more fully the procedure to be followed to insure that no one promoted under the terms of the consent decree stands in violation of federal civil rights laws. The City's letter is attached to this order as Appendix B.

presence of a governmental party; and the reaction of interested parties to the settlement. *See Officers for Justice,* 688 F.2d at 625.

## II. The Standards for Constitutional and Statutory Evaluation

■ In addition to evaluating the basic fairness and adequacy of the settlement, because the City is a party to the consent decree and because the decree provides for affirmative race-conscious relief, the court must find that the settlement satisfies two legal standards. There is no longer any question that "government bodies constitutionally may adopt racial classifications as a remedy for past discrimination." *Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC,* 478 U.S. 421, 480, 106 S.Ct. 3019, 3052, 92 L.Ed.2d 344 (1986). However, an affirmative action plan entered into by a municipality implicates state action and so must comport with the equal protection clause of the fourteenth amendment in addition to Title VII. *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 517 n. 8, 106 S.Ct. 3063, 3073 n. 8, 92 L.Ed.2d 405 (1986). *See Johnson,* 107 S.Ct. at 1446 n. 2; *Wygant,* 476 U.S. at 272 & n. 3, 106 S.Ct. at 1846 & n. 3; *Higgins v. City of Vallejo,* 823 F.2d 351, 352 (9th Cir.1987).

For reasons that remain somewhat elusive, the standards applicable to analysis under Title VII and the equal protection clause are not coterminous.[34] *Johnson,* 107 S.Ct. at 1449 n. 6. More often than not, the substantive requirements of equal protection are more stringent than those of Title VII and therefore the case to be made for a settlement incorporating race-conscious relief is more difficult for a public than for a private employer.

Although the substantive requirements of the law may differ, the framework of analysis is the same for both equal protec-

tion and Title VII analysis. An affirmative action plan must be evaluated according to a two part test under either Title VII or equal protection. First, there must be adequate justification for the use of affirmative action. *See Johnson,* 107 S.Ct. at 1452; *United States v. Paradise,* 480 U.S. 149, 172, 107 S.Ct. 1053, 1067, 94 L.Ed.2d 203 (1987); *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847; *Sheet Metal Workers,* 106 S.Ct. at 3050; *United Steelworkers v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979). Second, if the plan is justified, the court must then determine that it does not unnecessarily burden the rights of non-minority employees. *Johnson,* 107 S.Ct. at 1452; *Paradise,* 107 S.Ct. at 1067; *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847; *Sheet Metal Workers,* 106 S.Ct. at 3050; *Weber,* 443 U.S. at 208, 99 S.Ct. at 2729. *See also Higgins,* 823 F.2d at 356–57, 358.

### A. Justification Analysis

The Supreme Court has not agreed on the standard to be applied to affirmative action plans under the equal protection clause. *Paradise,* 107 S.Ct. at 1064 & n. 17. Courts have therefore exercised caution by applying strict scrutiny, that is, by requiring the plan to be "narrowly tailored" to serve a "compelling governmental purpose." *Id.* at 1064; *see Higgins,* 823 F.2d at 358.

The compelling governmental purpose language is not useful in the context of evaluating an affirmative action plan because that purpose is always the same. The purpose of the plan is *always* to remedy past or present discrimination. For a governmental entity this is always a compelling purpose. *Paradise,* 107 S.Ct. at 1065. The real issue to be resolved is the adequacy of the evidence of discrimination used to justify the plan.

---

34. Commentators have suggested that there is little justification for the divergence between Title VII and equal protection standards. See Rutherglen & Ortiz, *Affirmative Action Under the Constitution and Title VII: From Confusion to Convergence,* 35 UCLA L.Rev. 467 (1988); Schwartz, *The 1986 and 1987 Affirmative Action*

*Cases: It's All Over But the Shouting,* 86 Mich. L.Rev. 524 (1987); *see also Johnson,* 107 S.Ct. at 1461 ("[i]n my view, the proper initial inquiry in evaluating the legality of an affirmative action plan by a public employer under Title VII is no different from that required by the Equal Protection Clause") (O'Connor, J., concurring).

Equal protection requires evidence of past discrimination by the particular employer at issue in order to justify affirmative race-conscious relief. *See Sheet Metal Workers,* 106 S.Ct. at 3050. A plurality of the Court in *Wygant* stated that the Court has required "some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." 476 U.S. at 274, 106 S.Ct. at 1847.

In *Paradise* and *Sheet Metal Workers,* the Court seemed to require more, holding that a finding of egregious, persistent and systematic past discrimination, specifically persistent and systematic discrimination was sufficient to justify court-ordered affirmative action. *Paradise,* 107 S.Ct. at 1065; *Sheet Metal Workers,* 106 S.Ct. at 3050 (race-conscious relief also may be justified "to dissipate the lingering effects of pervasive discrimination"). In both cases, without specifying what showing was required as a minimum, the Court held that a finding amounting to intentional past discrimination justified the district court's award of an affirmative race-conscious remedy.

There is a distinction drawn, however, between the evidence of past discrimination needed to justify court-ordered relief and that required for voluntary action by a public employer. In *Wygant,* a plurality of the Court would have required less than evidence of intentional discrimination to justify a public employer's voluntarily adopted affirmative action plan. Specifically, Justice Powell joined by three other Justices would have required only a "strong basis in evidence," for a finding of past discrimination sufficient to justify a public employer's voluntarily undertaken plan. *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848.

In her concurrence, Justice O'Connor expanded on the "strong basis in evidence" or, as she calls it, the "firm basis" standard. *See id.* at 286, 106 S.Ct. at 1853 (O'Connor, J., concurring). She wrote that "a contemporaneous or antecedent finding of past discrimination by a court or other competent body is not a constitutional prerequisite to a public employer's voluntary agreement to an affirmative action plan." *Id.* at 289, 106 S.Ct. at 1854. Her policy concern was that if public employers were compelled to demonstrate their own history of illegal discrimination in order to justify the adoption of voluntary affirmative action programs, they would necessarily be discouraged from voluntarily complying with their civil rights obligations. *See id.* at 290, 106 S.Ct. at 1855. Justice O'Connor suggested that statistical evidence of disparity sufficient to support a prima facie case under Title VII would justify (that is, constitute a "firm basis" for believing remedial action was required) voluntary affirmative action consistent with the Constitution. *See id.* at 292, 106 S.Ct. at 1856. *See also Johnson,* 107 S.Ct. at 1461 (O'Connor, J., concurring). A majority of the Court is agreed that a gross statistical disparity alone may satisfy the prima facie standard. *See Hazelwood School District v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977). See also *Johnson,* 107 S.Ct. at 1453 n. 11 (opinion of Brennan joined by Marshall, Blackmun, Powell and Stevens, JJ.) and at 1461 (O'Connor, J., concurring).

Statistical disparities, however, provide a reliable indicator of past discrimination by a particular employer only in cases where past societal discrimination is not a factor that needs to be screened out. The only cases where societal or industry-wide discrimination need not be screened out are those in which the remedy sought to be justified affects entry-level or non-skilled hiring, or where the remedy relates to promotions but the applicant pool is wholly internal. For entry-level or nonskilled positions, the probative statistical comparison is between the percentage of minorities in the employer's work force and the percentage of minorities in the relevant labor market. *See Hazelwood,* 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13. Where, as in the SFFD, promotions are made entirely from the lower ranks and there is therefore no outside labor pool, the probative statistical comparison is between the percentage of minorities in each of the upper ranks and

the percentage of minorities in the qualifying rank below. Because all hiring is entry-level and non-skilled there is no need to screen for the effects of societal discrimination (in access to training and skills) that may not be used to justify the adoption by or imposition on a public employer of affirmative race-conscious relief.

When societal or industrywide discrimination has been a factor in constraining the employment advancement of minorities, it will be impossible to establish a prima facie case by statistical comparison alone. This is because in order to screen out the effects of general discrimination (as opposed to discrimination for which the employer is directly responsible), the probative statistical comparison is between the percentage of minorities in the employer's skilled work force and the percentage of minorities in the relevant labor force *who possess the required skills. See Hazelwood*, 433 U.S. at 308 & n. 13, 97 S.Ct. at 2742 & n. 13. Where minorities have historically been denied access to training, see, e.g., *Weber*, 443 U.S. at 198 n. 1, 99 S.Ct. at 2725 n. 1, this statistical comparison generally will not reflect a disparity. *See Johnson*, 107 S.Ct. at 1452 n. 10.

Where generalized societal discrimination has prevented minorities from acquiring the skills necessary to become part of the qualified labor force, the statistical comparison is too crude to establish a prima facie case.[35] Ironically, the lack of imbalance between the percentage of minorities in the employer's work force and the percentage in the qualified labor force prevents public employers "in precisely those [areas] in which discrimination has been most effective" from voluntarily adopting affirmative race-conscious remedies for employment discrimination. *Id.* In order to justify such action consistent with the Constitu-

tion, a public employer would need to come up with non-statistical evidence of past discrimination, *see id.* at 1453 n. 11, and that could only be evidence of *intentional* discrimination. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 & n. 20, 97 S.Ct. 1843, 1857 & n. 20, 52 L.Ed.2d 396 (1977). It is reasonable to predict that in these circumstances, public employers will be significantly deterred from voluntarily complying with their obligations under the civil rights laws, because to do so would expose them to liability for past discrimination.

By contrast, the statutory standard under Title VII does not require evidence of past discrimination by a specific employer to justify that employer's voluntary adoption of an affirmative action plan. *See Johnson*, 107 S.Ct. at 1452–53. Last term in *Johnson*, the Court took its earlier ruling in *Weber* respecting private employers and extended it to public employers. The Court held that voluntarily adopted race-conscious remedies for past discrimination could be justified by public agencies under Title VII by showing only the existence of a "manifest imbalance" reflecting underrepresentation of minorities or women in "traditionally segregated job categories." *Johnson*, 107 S.Ct. at 1452 (quoting *Weber*, 443 U.S. at 197, 99 S.Ct. at 2724).

With respect to training programs or to jobs that demand no special skills, a manifest imbalance can be established by comparing "the percentage of minorities or women in the employer's workforce with the percentage in the area labor market or general population." *Id.* With respect to jobs demanding special skills or training, however, "the comparison [of the percentage of minorities or women in the employer's skilled work force] should be with those in the labor force who possess the

---

**35.** The statistical comparison is too crude except in those cases where the agency has never in its history hired from a particular minority group. Justice O'Connor draws on this phenomenon, first identified in *Teamsters* as "the inexorable zero." *Johnson*, 107 S.Ct. at 1465 (O'Connor, J., concurring) (quoting *International Bhd. of*

*Teamsters v. United States*, 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 1858 n. 23, 52 L.Ed.2d 396 (1977). Given that minorities almost always constitute at least some meager but positive percentage of the qualified labor force, where the agency has *never* hired from .among that

relevant qualifications." *Id.*[36]

Clearly, if there is sufficient evidence to justify the consent decree in this action under the constitutional standard, it will also pass muster under Title VII's statutory standard. Accordingly, the court will apply only the constitutional "firm basis" standard to determine whether the terms of the decree are justified.[37]

## B. Burdens Analysis

■.] Several factors are relevant in determining whether the justifiable remedy is nonetheless too burdensome to innocent nonminorities. These factors are the same under the "narrowly tailored" inquiry of equal protection analysis as they are under Title VII because the inquiries are conceptually identical.

The factors to be considered in evaluating the permissible burden of justified affirmative relief include: whether the plan unnecessarily trammels the rights of non-minorities; whether the plan acts as an absolute bar to non-minorities; whether the plan requires "blind hiring" of minority applicants without regard to qualifications; whether the plan uproots legitimate expectations of non-minorities; whether the plan requires rigid quotas or flexible goals; and whether the plan is temporary or designed to maintain a balanced work force.[38] *See,*

---

minority, the statistical disparity is "sufficient for a prima facie Title VII case." *Id.*

**36.** The *Johnson* majority found that it was necessary to identify the skilled labor force as the relevant labor market for purposes of comparison (rather than the general labor force) in order to avoid blindly *hiring* unqualified minorities and women in numbers sufficient to eliminate the statistical disparity. 107 S.Ct. at 1454. This, of course, makes no sense. The way to avoid forcing the hiring of unqualified personnel is to forbid blind hiring. The way, however, to encourage public employers voluntarily to adopt affirmative action plans consistent with Title VII is to allow them to justify such action by demonstrating a manifest imbalance between minority representation in all job categories and minority representation in the general area labor force. The *Johnson* majority managed only to make the prima facie and manifest imbalance standards more alike.

**37.** A threshold issue is whether a consent decree falls into the category of purely voluntary plans or the category of court-ordered relief. Because a consent decree is an agreement freely negotiated by the parties, it is voluntary; but because it requires *court approval, it is in some sense* court-ordered relief. The Supreme Court has observed that consent decrees are not treated the same for all purposes and that the proper inquiry is whether, "given their hybrid nature, consent decrees implicate the concerns embodied in [the relevant substantive law provision] in such a way as to require treating them as 'orders' within the meaning of that provision." *Firefighters v. City of Cleveland,* 106 S.Ct. at 3074.

Applying this analysis, this court finds that the concerns embodied in the equal protection clause do not require that a consent decree be treated as an order. The Court has already ruled in the context of Title VII that a consent decree falls into the category of voluntary plans. *Id.* at 3075. This holding was based on the

observation that one of the legislative concerns in enacting Title VII was to avoid government interference with management decisions. *See id.* at 3074–75 & n. 10 (there is "no indication that Congress intended to leave governmental employers with less latitude under Title VII than had been left to employers in the private sector."). In the context of equal protection, which contains no direct proscription of certain types of court ordered relief, there is no reason to treat the consent decree as an order rather than a voluntary agreement. "[T]he voluntary nature of a consent decree is its most fundamental characteristic." *Id.* at 3075. There is nothing in the language or spirit of the fourteenth amendment that would require the relief embodied in a Title VII consent decree to be construed as an order.

Further, while the Court has not yet directly addressed this question, there is some indication that in the constitutional context a consent decree should be evaluated according to the same criteria as purely voluntary plans. *See, e.g., Johnson,* 107 S.Ct. at 1451 & n. 8; *Firefighters v. City of Cleveland,* 106 S.Ct. at 3073 & n. 8. The court sees no reason to treat a consent decree as other than a voluntary settlement device.

Nor is there any reason to distinguish based on when in the litigation a consent decree is reached. The question is voluntariness vis-a-vis a court order. For the court to measure the degree of voluntariness based on the pressures or stage of litigation would result in needless ancillary proceedings. Such a determination is not required by the case law. In fact, the Supreme Court has suggested otherwise. *See Firefighters v. City of Cleveland,* 106 S.Ct. at 3073–77. Accordingly, the court will evaluate the consent decree as a voluntary plan under both equal protection and Title VII analysis.

**38.** Certain remedies, most notably layoffs, are apt to be found unduly burdensome in most circumstances. *See Wygant,* 476 U.S. at 282–84, 106 S.Ct. at 1851–52.

*e.g., Johnson,* 107 S.Ct. at 1454–56; *Paradise,* 107 S.Ct. at 1067; *Higgins,* 823 F.2d at 357. The court will consider these factors in evaluating the terms of the consent decree.

## DISCUSSION

■ The settlement of this case was hard fought and hard won. San Francisco has long prided itself on its reputation for celebrating rather than discriminating on the basis of human diversity. No party more than the City wants the SFFD to end this lengthy, divisive litigation and get on with the business of serving the San Francisco community.[39]

### I. *Review for Fairness*

The first question to be addressed by the court is whether the settlement reached is fair, adequate and reasonable. *See Officers for Justice,* 688 F.2d at 625. For the City, the risks of continuing with this litigation were many, and plaintiff-intervenors' case was strong. The City repeatedly has been admonished by courts and repeatedly has failed to produce entry-level and promotional employee selection procedures that are valid under Title VII. As a result, the SFFD has required court supervision in order to hire and promote uniformed firefighters for close to the last twenty years. This court has already entered partial summary judgment against the City on the liability issues. *See Davis I,* 656 F.Supp. at 288.

Further, the court recently found that the SFFD is either unwilling or unable to enforce the provisions of the civil rights laws. See *supra,* p. 1298. In addition, the City had substantial indication from the reports of the monitor that there was a good case to be made against the SFFD for racial harassment. Indeed, at the fairness hearing, the City revealed that its primary motive in negotiating and agreeing to the consent decree was to avoid the risk that

the court would make a finding of intentional discrimination after trial and award relief more onerous than that imposed by the terms of the decree. Finally, although discovery was virtually complete, not only would a trial on the harassment issues have been long, complex and costly, but whatever the result, general publication of the evidence at trial, which this court previewed at various pretrial proceedings, would almost certainly have been extremely embarrassing and demoralizing to the SFFD.

The objections of the United States[40] and the Union are addressed specifically to the standards mandated under Title VII and the Constitution and will be discussed below. The objections filed by individual firefighters and members of the public, however, do go to the general issue of the fairness of the consent decree and so it is appropriate to consider them at this juncture.

One hundred thirteen persons took the time and effort to file written objections with the court. The great majority filed on forms provided by the Union. Many of those who filed objections had given the competing interests considered thought and some offered alternative proposals. Some, however, do not understand that the fundamental premise of compromise is that no party gets everything it wanted; each has to give something up. Others fail to understand that it is both fair and reasonable to require those who have been the passive beneficiaries of past discrimination to bear some of the burden in remedying the harm caused to others.

The court cannot here answer each objection. However, the objections fall into certain broad categories that will be addressed. Almost all the objections concerned the changes in promotional practices, as opposed to hiring practices, made in the decree.[41] Many objected that those mi-

---

**39.** The City has repeatedly recognized in hearings and settlement discussions that an integrated fire department is not only legally required but is better equipped to serve the citizenry than a men's club closed to all but the White sons of present and former San Francisco firefighters.

**40.** See *supra,* note 3.

**41.** Significantly, there were almost no objections to the terms of the decree that provide affirmative action for women. This may be attributable to the fact that the consent decree does not provide for the immediate promotion

norities promoted to H20 fire lieutenant pursuant to the decree did not qualify on the merits by passing a test. This argument, of course, fails to account for the fact that the City has conceded that the H20 tests previously used have not been shown to be job-related. Thus, those who passed the test are not demonstrably more qualified to perform the job of fire lieutenant than those who failed. A related objection is that departmental morale will be adversely affected by the promotion of unqualified personnel. The court hastens to assure and to remind the members of the SFFD that the decree specifically provides that no one who is not qualified shall be hired or promoted according to its terms.

Others objected to the loss of educational credits which will no longer be taken into account in promotions. These credits, however, have not been shown to be job-related. Similarly, some firefighters objected to the failure of the affirmative remedies to take seniority into account; two men objected to consideration of intra-minority seniority. However, to take seniority into account, in view of the SFFD's persistent discrimination in hiring, would only serve to confirm rather than to remedy past discrimination. Some claimed the SFFD has already done its best; others objected that the City had caved in and should have done more to defend the tests. These assertions are belied by irrefutable evidence of a series of exams having an adverse impact on women and minorities. Still others complained that the testing schedule was unrealistic. This may already have proven too true. However, it is not grounds for invalidating the decree.

The terms of the consent decree are fair. The firefighters hired pursuant to the provisional hiring order in *Davis I*, 656 F.Supp. at 292–93, will be given permanent status retroactive to their hiring dates if they pass a special test to be given no later than October 1 of this year. This test will be additional insurance of their qualifications for the job, although their tenure alone strongly suggests they are qualified.

of any women, but only sets up future hiring

The promotional remedies are likewise fair. To remedy the adverse impact of the 1978 H20 fire lieutenant's exam, the next six Black firefighters from the 1978 list will be promoted with back pay retroactive to March 9, 1979. They will also be afforded the opportunity to take a special H30 test for the rank of captain in an effort to put them in the same position for promotion they would have been in had they been appointed lieutenants in 1979. In addition to these six men, the decree calls for the promotion of 27 minority firefighters from the invalid 1984 H20 fire lieutenant list and of up to 48 more lieutenants of which 25% shall be minority firefighters. This will act to stem the shortage of lieutenants and to get qualified minority firefighters quickly into the upper ranks after twenty years of virtual exclusion. It will also be an opportunity for promotion for a number of firefighters, many of whom will be White, who have long waited for promotion. As the City pointed out at the fairness hearing, these promotions will not be blind. Race will be only one consideration among others, including each candidate's work history and performance evaluations. The 1984 list is to be used only to create a non-arbitrary tentative list of candidates. To the extent that the provisions of paragraph 16 of the consent decree conflict with the City's representations that work qualification factors other than rank on the 1984 list and race will be considered in making these promotions, the City's representations prevail and the consent decree is deemed amended.

Further, the actual numbers of race-conscious appointments are modest. A representative of the California FEHC who appeared at the fairness hearing said that while the FEHC had agreed to accept the terms of the consent decree in lieu of the relief it had awarded in 1982, if the numbers of minority appointments were reduced then the FEHC would reconsider its decision to take no further action against the City. She explained that the numbers set out in the decree were already substan-

goals.

tially lower than what the FEHC would have required.

Finally, it is eminently fair that those firefighters who stand in violation of Title VII should be expressly prevented from benefitting from the terms of the decree. While such firefighters, should they remain with the SFFD, will be eligible for promotion through the regular process of testing, it would be patently unjust to allow those who had violated the civil rights laws to benefit from a decree that is intended to redress those violations.

The hiring and promotional[42] goals set by the parties are modest in view of the demography of the City. Although the goals have some teeth, they are flexible. Most importantly, they are expressly subject to the availability of qualified applicants.

As important as it is that the plan is fair, it is just as important that it is comprehensive, flexible and designed in a continuing spirit of cooperation between the parties. It therefore has a good chance of achieving some immediate and measurable success in wiping out the present effects of past discrimination. The plan is comprehensive in that it creates a whole system that deals with issues including test development, recruitment, the timing of the administration of tests and the duration of promotional lists, grievance procedures for complaints regarding both testing procedures and racial harassment, human relations training, issuance of appropriate equipment to all firefighters and provision for a court-appointed monitor who will supervise the implementation of the decree. The parties have agreed to cooperate on test development and to create procedures for resolving disputes that may arise in the event of changed circumstances.

Most importantly, the hiring goals of this decree, while flexible, are meaningful. Failure to achieve the goals must be justified to the court and cannot be explained away unless the test in question both comports with the Uniform Guidelines and eliminates or minimizes adverse impact.

The requirement that the City justify a failure to meet a hiring goal does not make the goal a rigid quota. This provision is essential in light of the City's history of producing facially neutral exams with a significant adverse impact on minorities and women and the failure of the City to achieve the goals it negotiated for itself in the *WACO* consent decree. Indeed, the decree would be wholly inadequate and destined to fail in the absence of a provision requiring the City to justify its failure to attain the modest goals outlined in the decree.

Accordingly, the court finds the consent decree to be fair, adequate and reasonable.

## II. *Statutory and Constitutional Review*

The terms of the consent decree are narrowly tailored to achieve a compelling governmental purpose. *See Higgins*, 823 F.2d at 358. The compelling purpose is to remedy the City's pattern and practice of discrimination in hiring and promotion on the basis of race and sex. The decree not only seeks to stop present discrimination but provides the means to eradicate the present effects of past discrimination. These purposes are entirely consistent with both Title VII and equal protection. *See Johnson*, 107 S.Ct. at 1452; *Paradise*, 107 S.Ct. at 1065.

The remedies provided for in the consent decree are necessary and justified by a firm basis in evidence. The City has proven itself unable to arrive at employee selection procedures which do not have an adverse impact on minorities and women. Plaintiff-intervenors have shown statistical disparities sufficient to establish a prima facie case of discrimination in both hiring and promotion under Title VII and the City has admitted that the tests used were not demonstrably job-related. *See Davis I*, 656 F.Supp. at 282. Affirmative remedies are required because the City has proved unresponsive to its duties under Title VII and the injunction of this court to come up with valid employee selection procedures. Af-

---

42. The promotional goals are necessarily dependent on the success of minority entry-level

hiring because the promotional process is entirely internal. See *supra*, note 16.

firmative race-conscious relief is the only effective means to assure the enjoyment of equal employment opportunity and to prevent further delays by the City. *See Paradise*, 107 S.Ct. at 1067; *Sheet Metal Workers*, 106 S.Ct. at 3036–37.

The Union points out that as of last February the court did not believe there to be sufficient evidence in the record to order race-conscious affirmative relief, *see Davis I*, 656 F.Supp. at 288–89, and that little has been added to the record since then. Although there may not have been sufficient evidence to justify *court-ordered* affirmative relief at that time, there was sufficient evidence to justify the *voluntary* adoption of an affirmative action plan. Further, significant evidence regarding racial harassment was added to the record only after the entry of permanent injunctive relief.

The Union raises the City's "good faith" efforts as if good faith were a bar to this court's approval of the settlement. Additional relief is unnecessary, claims the Union, because the injunctive relief awarded in *Davis I* in combination with the City's good faith efforts to reduce the adverse impact of its hiring and promotional tests are sufficient relief. The Union, however, cites no authority for the proposition that an employer's good faith is an adequate substitute for concrete remedial action. Of course, it is not. Further, while there is no finding that the City intentionally discriminated in hiring and promotion in the SFFD, there is no evidence to support a finding of good faith. To the contrary, the City has repeatedly failed to come up with valid employee selection procedures despite court orders, an earlier consent decree and a series of promises. While over recent months the City has conducted negotiations in this case in apparent good faith, this represents a marked change from twenty years of indifference and failure to produce valid tests. In light of this history the court cannot rely merely on current protestations by the Union on behalf of the City's good faith.

Finally, the Union contends that the relief in the consent decree is not warranted because its statistical comparisons are based on the wrong relevant work force. Residence in the City has always been a prerequisite for employment in the SFFD and the residency requirement is included in the consent decree. Yet the Union now contends that the relevant work force for purposes of comparison is the Standard Consolidated Statistical Area ("SCSA"). The SCSA includes the nine counties surrounding San Francisco as well as the City. It is contended that when the representation of minorities in the SFFD is compared with their representation in the SCSA, there will be almost no statistical disparity. The Union, however, does not explain why the SCSA work force suddenly, after years of an in-City residence requirement for initial employment in the SFFD, is inherently more relevant for purposes of comparison than the City and County of San Francisco work force; the Union only argues that the SCSA is more White.

In support of its argument for the use of the SCSA, the Union cites only one case, *Hammon v. Barry*, 826 F.2d 73 (D.C.Cir. 1987), decided in the wake of the Supreme Court's most recent affirmative action decisions. In that case the court found that the relevant labor force was the greater Washington metropolitan area rather than only the city of Washington, D.C. *Id.* at 77.

First, the D.C. Circuit's ruling in *Hammon* is inapplicable to this case. In the case of the District of Columbia fire department, there never had been an in-city residence requirement. The reason the court identified the metropolitan area as the relevant work force was that "it is undisputed that approximately half of the District's entry-level firefighters have hailed from the suburbs." *Id.* By contrast, the SFFD has always maintained an in-city residence requirement for entry-level hiring. The Union has provided the court with no good reason to disregard that fact at this juncture. Further, in *Officers for Justice v. San Francisco Civil Service Commission*, a parallel Title VII suit against the City's Police Department, a similar in-city residence requirement was approved. *See* 473 F.Supp. 801, 808, 812 para. 5 (N.D.Cal. 1979), *aff'd*, 688 F.2d 615 (9th Cir.1982),

*cert. denied,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983).

Second, the court agrees with Judge Mikva who, dissenting from the opinion of the court in *Hammon,* wrote that "[b]y cavalierly asserting that the Washington metropolitan area is the relevant labor market and then concluding that minorities are *over* represented in the Fire Department, the majority adds gratuitous insult to grievous injury." 826 F.2d at 91 (Mikva, J., dissenting). Judge Mikva pointed out that since the employees of the District of Columbia government, excluding the fire department, reflected the representation of minorities within the city, there was no reason to find that the metropolitan area provided a more appropriate comparison for purposes of measuring adverse impact. *Id.*

Moreover, in view of the Union's historical opposition to the City's efforts to comply voluntarily with its duty under the civil rights laws, there is something patently offensive in the Union's argument that after many years of observing a city residence requirement the SFFD should suddenly be held to the standard of the representation of minorities in the wealthy and largely White outlying counties of San Francisco such as Marin. The SFFD serves not Marin County but the citizens of San Francisco, who are more diverse in race and national origin and have a right to demand that their diversity be reflected rather than denigrated in the SFFD. Also offensive is the Union's argument that the lieutenant promotions are not necessary because the SFFD has operated effectively without permanent appointments for many years. The Union would like this court to ignore its frequent complaints about the delays in promotions and the damage this has wreaked upon the SFFD and the members of the Union—complaints consistently reiterated at every court hearing until the consent decree was offered.

Having found that the remedies provided in the consent decree are justified, the court also concludes that the remedies are narrowly tailored to accomplish the purpose of eradicating the past and present effects of the City's discrimination. Using the most stringent test as presented in *Paradise,* the court will consider whether the terms of the decree are sufficiently flexible, 107 S.Ct. at 1070; whether the decree is temporary, *id.* at 1071; the relationship between the numerical relief and the percentage of minorities in the relevant work force, *id.;* and whether the relief provided places an unacceptable burden on innocent third parties, *id.* at 1073.

The hiring goals and specific minority hiring requirements set out in the decree are highly flexible. First, the decree specifically provides that no provision—including the specific hiring provisions—shall be construed as a quota, nor shall any term of the decree be interpreted to require the hiring of any person not qualified for the job. This will operate as a waiver in the highly unlikely event that there are no minority firefighters qualified for the rank of lieutenant. Further, the City has stated on the record that in hiring from the 1984 H20 list pursuant to the terms of the decree, race and test score will not be the only factors. Past performance and work history will also be considered in making the promotion decision. Again, to the extent the City's representations in this regard are in conflict with the consent decree at paragraph 16, the City's representations prevail and the consent decree is deemed amended. In addition to rank on the 1984 list and race, past performance on the job and work history shall also be considered in making these promotion decisions.

Second, there are numerous provisions for adjustment of the requirements of the decree should the parties' predictions regarding future hiring be rendered inaccurate by lack of need, budget cuts and the like. *See Paradise,* 107 S.Ct. at 1070. In order that flexibility not be so great as to make the plan meaningless, however, the parties must justify any changes to the court. The court has already permitted the adjustment of deadlines for test development.

As to the temporary duration of the affirmative action plan, seven years is reasonable and necessary in view of the stag-

gered testing schedule which is the heart of the decree. It is the careful arrangement and adjustment of the schedule of promotional tests that will allow the regular advancement of qualified minorities and women into the supervisory ranks of the SFFD and thus gradually eliminate the vestiges of past discrimination.

Next, as discussed above, the numerical relief is closely related to the relevant labor force. The court has already rejected the Union's argument that the SCSA rather than the City and County of San Francisco is the relevant labor market. The Union must concede that the hiring and promotional goals set in the decree are modest with respect to the representation of minorities and women in the City. Had there been a finding of racial harassment after trial, this court might have constitutionally ordered one-for-one hiring as a remedy. *See Paradise,* 107 S.Ct. at 1070–71. In view of the facts that the City admittedly feared the imposition of such relief and that the FEHC stated on the record that it would consider taking further action against the City if the terms of the decree were altered to promote fewer minorities, the numerical relief afforded by the decree is indeed modest as well as closely related to the relevant labor market.

The decree requires the promotion of only 33 minority firefighters to the rank of lieutenant. Should the SFFD need to promote an additional 48 from the 1984 H2 list, then 25% of those appointments must be from among minority firefighters. These numbers are not out of line with the representation of minorities in the firefighter's rank, which is the relevant work force for comparing representation at the next highest rank. See discussion *supra,* pp. 1302–03. The City has indicated that these numbers were arrived at through negotiation. Further, the numerical relief is less extensive than what the court might have ordered after a finding of racial harassment.

Finally, the terms of the decree do not unnecessarily trammel the rights or uproot the legitimate expectations of nonminority or male employees and therefore do not impose an unacceptable burden. The decree imposes no layoffs, *see Wygant,* 476 U.S. at 282–84, 106 S.Ct. at 1851–52, nor does it impose an absolute bar to the advancement of White males, *see Sheet Metal Workers,* 106 S.Ct. at 3052. Not even the promotion of 33 minority firefighters to the rank of lieutenant imposes an unacceptable burden because the decree also permits the promotion of a large number of White firefighters to lieutenant.

In yet another burst of novel legal argument, the Union contends that the decree unnecessarily trammels the rights of White employees because it does not *require* the City to promote White firefighters. The City cannot, however, be required by consent or by this court to promote White firefighters because there has been no showing of discrimination against that group; it can only be required to be fair in choosing among qualified applicants. *See Paradise,* 107 S.Ct. at 1073. The Union also argues that the decree does not require the 33 minority firefighters to be promoted to lieutenant to be qualified. This contention is patently false for the reasons stated above.

Further, the Union argues that the numerical hiring provision is not tailored narrowly enough because the minority firefighters to be promoted from the 1984 H2 list were not harmed by that list as it was never used. The City has explained, however, that the promotions from the 1984 list are the result of compromise in negotiating the settlement and are not a remedy for any harm caused by the 1984 test. The 1984 list is being used only as a better than arbitrary means of generating a list of firefighters eligible for promotion. Work performance and past record will also be considered in making promotion decisions. See *supra,* pp. 1309–10.

The hiring and promotional goals only make race one "plus" factor among many in employment decision making. *See Johnson,* 107 S.Ct. at 1457. All candidates must be qualified; the decree does not mandate, nor does it permit, blind hiring. Finally, the goals are temporary and flexible. The effect of the decree will be to help achieve,

rather than to maintain, a racially and sexually balanced work force.

The City has resolved the United States' objection that the consent decree restricts its rights under the terms of the permanent injunction to consult on the development of future hiring and promotional tests by stating in the record that it will accord the United States all rights set out in *Davis I.* There is nothing in the consent decree that contradicts or restricts those rights. The consent decree settles the dispute between plaintiff-intervenors and the City. It does not purport to affect the rights of the United States.

Considering the long history and extensive facts demonstrating past discrimination, the relief afforded here is well within the parameters of the relief allowed in *Paradise, Firefighters v. City of Cleveland,* and *Sheet Metal Workers.* All the criteria of *Weber, Wygant* and their progeny have been satisfied. The terms of the consent decree are narrowly tailored to serve a compelling governmental purpose.

CONCLUSION

Based on the record before the court, having considered the arguments of the parties and alternative proposals, for the foregoing reasons, the court finds that the consent decree, as amended, is fair, adequate and reasonable, and narrowly tailored to serve a compelling governmental purpose. Accordingly, the consent decree is approved.

IT IS SO ORDERED.

APPENDIX A

In the United States District Court

for the Northern District of California

CONSENT DECREE

Filed May 20, 1988

PRELIMINARY STATEMENT

These are employment discrimination actions against the San Francisco Fire Department ("SFFD") brought by the United States and several individual and organizational plaintiffs and plaintiff-intervenors and joined as defendant-intervenor by San Francisco Firefighters Local 798. Plaintiffs allege that the City's administration of certain employment examinations for entry level hiring and promotional decisions unlawfully discriminated against women and minority group members in violation of Title VII of the Civil Rights Act of 1964, as amended in 1972, the Civil Rights Acts of 1866 and 1871, and the non-discrimination provisions of the State and Local Fiscal Assistance Act. Plaintiffs in intervention also allege that the SFFD has maintained, perpetuated, and failed to correct an atmosphere of racial hostility directed against minority firefighters.

The plaintiffs have, during the course of this litigation, introduced substantial evidence of discrimination by the SFFD. This Court has issued preliminary orders finding the defendants' selection practices and procedures for entry level and promotional positions to be discriminatory and in violation of federal law. In particular, on June 23, 1986, the Court found that the 1982 H–2 entry level examination adversely impacted women and minorities. Subsequently, the City conceded that the 1984 H–20 fire lieutenant promotional examination resulted in an adverse impact on certain minority groups. In addition, the Court of Appeal of the State of California has found that the California Fair Employment and Housing Commission correctly concluded that the 1978 H–20 fire lieutenant promotional exam discriminated against black firefighters in that it had an adverse impact on them and was not proven to be job related. *City and County of San Francisco v. Fair Employment and Housing Commission* (1987) 191 Cal.App.3d 976 [236 Cal.Rptr. 716].

In its order of February 26, 1987, this Court reviewed the history of this litigation and concluded that the City's selection and promotional practices for the positions of entry level firefighter, fire inspector, and fire lieutenant violated Title VII. Based upon that finding the Court granted declaratory and injunctive relief.

A further factual basis justifying the imposition of the foregoing relief is contained in the Statement of Undisputed Facts filed concurrently with this Decree.

The parties signatory to this Decree wish to avoid the delay and expense of continued litigation and desire to insure that any disadvantage to minorities and females that may have resulted from past employment practices be remedied so that equal employment opportunity will be provided to all.

The Court has jurisdiction over the parties and subject matter of this action.

The signatories, by agreeing to the issuance of this Decree, waive the hearing and findings of fact and conclusions of law on all issues raised by the complaints, and the parties have mutually agreed to the entry of the Consent Decree. Defendants, by entering into this Consent Decree, do not thereby admit any violations of law, rule or regulation with respect to the allegations made by plaintiffs, private or governmental, in their complaints. By entering into this Consent Decree, defendants do not concede the validity of the Court's finding of unlawful discrimination.

The Court having been fully advised and informed of the facts and circumstances, and good cause appearing therefore,

NOW, THEREFORE IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

## I. EFFECT OF THE CONSENT DECREE

This Decree is entered into as a settlement of the remaining existing disputes between the private plaintiffs and plaintiff-intervenors and defendants as to appropriate and valid procedures for the hiring and promotion of firefighters for the City and County of San Francisco. It also provides for specific, definable and good faith efforts to be made by defendants to achieve certain goals for employment of women and minorities as herein defined, within specified periods of time. This Consent Decree satisfies and resolves all claims of the private plaintiffs and the classes they represent, of racial, ethnic, national origin, and sex discrimination with respect to those matters set forth in the complaints and the previous orders of this Court.

Both private plaintiffs and the classes they represent shall seek no further relief for the acts, practices or omissions alleged in the complaints save to enforce the provisions of this Decree, thereby waving the right to seek further relief.

Private plaintiffs and plaintiff-intervenors agree that this Consent Decree is fully binding individually and on the classes they represent. Defendants agree that this Consent Decree is fully binding on each of them, each of their officers, agents, employees and successors, and all other persons acting in concert with them who have notice of this Decree.

## II. GENERAL

1. The permanent injunctive relief set forth at pages 31–38, Paragraphs 1–3, 5–6, 8–9, 12–14, of the Court's order of February 26, 1987, as modified by agreement of the parties, attached hereto as Exhibit "A" and incorporated herein as though fully set forth, shall remain in effect for seven years from the date of the entry of the order approving this Decree.

2. In the event the entry of this Consent Decree generates, either through intervention or separate lawsuits, attacks on the lawfulness of any of the provisions contained herein, the parties hereto agree and warrant that they shall defend said provision or provisions against such attacks. If any such lawsuit is brought in state court against the defendants, defendants shall seek to remove such action to the Federal District Court and the signatories shall support said action.

3. The defendants have required in the past, and shall continue to require, that applicants for the rank of H–2 firefighter be *bona fide* residents of the City and County of San Francisco at the time of and for a period of four months prior to the time of their application and through the date of appointment, with residence after appointment to be maintained as permitted by City and State law. The parties therefore agree that the relevant geographic labor market for firefighter applicants is the City and County of San Francisco. However, upon application of the City, the

Court may delete or modify this residency requirement in order to effectuate the purposes of this Decree and to allow the SFFD to recruit well-qualified applicants for entry-level firefighter positions.

4. All entrance and promotional examinations required by this Decree shall be developed and administered by a test development committee consisting of qualified personnel employed by the City's Civil Service Commission and qualified outside experts selected by the City and approved by the Court. The City will consult with counsel for plaintiffs and plaintiff-intervenors regarding all aspects of test development and administration.

5. Notwithstanding applicable provisions of the City Charter of the City and County of San Francisco, the following shall apply to all entrance and promotional examinations required by this Decree:

(a) The test development committee designated in Paragraph 4 shall determine how that examination shall be weighted, scored, and graded;

(b) In promotional examinations, the test development committee shall determine whether points shall be awarded on the basis of seniority and/or education;

(c) The test development committee shall determine whether any examination shall consist of hurdles which must be passed before an applicant can go on to the next step of the examination;

(d) Examinations shall be exempt from inspection requirements.

The use of a selection procedure or examination shall not justify failure to meet a goal set out herein unless the procedure or examination is shown to be valid under the *Uniform Guidelines on Employee Selection Procedures* and to eliminate or minimize adverse impact consistent with the Uniform Guidelines.

## III. HIRING GOALS

6. In order to eradicate the present effects of past employment practices with respect to minorities and women, the City shall adopt and seek to achieve as a long term goal the recruitment, appointment, retention, and promotion of qualified minorities and women in sufficient numbers so as to increase substantially the minority and female composition of the San Francisco Fire Department, so that it more nearly reflects the racial, ethnic, and sexual composition of the relevant labor force of the City and County of San Francisco. For the purposes of this Decree, the long term goal of the City shall be to raise the minority representation to forty percent (40%) and the female representation to ten percent (10%) of the sworn personnel of the San Francisco Fire Department.

7. The hiring and promotional objectives set forth herein are goals rather than quotas. Nothing herein shall be interpreted to require the hiring or promotion of unqualified persons. In order to meet these goals the City shall carry out an aggressive and specifically delineated recruitment plan, developed with the assistance of all parties, to identify, recruit, and retain well-qualified applicants for positions in the SFFD. Applicants for positions in the SFFD must be at least 18 years of age.

8. The following provisions shall apply to the provisional firefighters hired pursuant to the Court's order of February 26, 1987:

(a) They shall receive all economic and fringe benefits, including accrual of vacation, sick leave, and other normal benefits of employment, as though they had been appointed permanent entry level firefighters in the normal course;

(b) They shall be allowed to take a special examination developed by the SFFD Bureau of Training to test job knowledge, performance, and fitness no later than October 1, 1988. Upon successful completion of said examination, they shall be treated as though they had been appointed as probationary firefighters in the normal course of SFFD hiring procedures, and shall acquire permanent status, with appropriate seniority dates, as of the dates of their original appointments.

9. For all hiring and promotions which take place while this Decree is in effect the

word "goal" shall mean a target figure for hiring, promotion, or any other relevant employment purpose. If a goal specified in the Consent Decree is not reached within the specified time period as to that goal, then the City shall present to the Court the reasons for the failure to meet the goal, and if the reasons presented are found unlawful or inadequate, a plan for meeting the goal within a specified period of time. The Court shall determine the adequacy of reasons and plans in relation to goals that are not reached, and the Court shall retain the power to order lawful actions and remedies, in addition to those specified in this Consent Decree, to accomplish the achievement of goals that the defendants have failed to meet. For purposes of evaluating the City's progress in meeting the hiring goals specified in this Decree, it is agreed that at least 500 entry level firefighters will be hired during the life of this Decree. If the City does not meet this level of hiring, the parties may move the Court to alter the hiring goals specified herein.

(a) *Women.* For each entrance examination administered during the life of this Decree the overall goal for the hiring of women shall be ten percent (10%).

(1) Fifty percent (50%) of this goal will be targeted for minority women;

(2) A higher goal may be imposed if recruitment and selection efforts reveal there are sufficient qualified candidates.

(b) *Minorities.* For each entrance examination administered during the life of this Decree the overall goal for the hiring of minorities, to be achieved by affirmative and aggressive recruitment efforts, shall be fifty-five percent (55%). For each minority group protected under this Decree (Asian, Black and Hispanic) the minimum goal shall be the CLF percentage as reflected in the official 1980 and 1990 U.S. Census Reports. As of the date of this Decree, those figures are deemed to be Asians, 19 percent; Blacks, 10 percent; Hispanics, 11 percent.

10. Notwithstanding the applicable provisions of the San Francisco City Charter, the City may determine, in light of difficulties of administration and anticipated hiring needs, to test less than all of those persons who apply to take an entry level examination. In the event that the City decides to utilize this provision, it shall insure that those being tested reflect the racial, ethnic, and sexual composition of the entire pool of those who apply to take the particular examination. Those selected for testing pursuant to this provision shall be chosen by random selection.

## IV. PROMOTIONS

11.(a) The Fire Department shall immediately appoint Robert Demmons, Audry Lee, Jimmie Braden, Worthy Brooks, Tyrone Rockett, and Bernie Wangara to the position of permanent fire lieutenant with a retroactive date of appointment of March 9, 1979, and award them backpay from that date, taking into account the applicable base rates of pay for fire lieutenant and their actual regular earnings (not including overtime) plus interest since that date.

(b) The City's Civil Service Commission shall give a special examination similar to the 1984 examination for the position of fire captain (H–30) to the six black firefighters promoted to the position of fire lieutenant pursuant to the provisions of this Paragraph 11(a). The examination shall be administered following an adequate opportunity for study and preparation no later than April 1, 1988. The results of that make-up captain's examination will be integrated with the existing list for promotion to fire captain, so that the scores of those who take the make-up examination are statistically correlated with those who took the examination leading to the existing captain's list. At that time the order freezing promotions from that list shall be lifted. Those Black firefighters whose score on the make-up captain's examination would place them within the range of those already promoted to captain from the existing captain's list will be immediately promoted to the position of fire captain, with their seniority in that position determined retroactively. The other Black firefighters who pass the special examination for fire

captain will remain on the captain's eligibility list until either they receive promotions or the list expires.

12. For each promotive examination given during the lifetime of this Decree, the goal for the promotion of minorities and women shall be the percentage of minorities and women in the eligible applicant pool. For the purposes of this section "applicant pool" is defined as those who are eligible to and do participate in the examination process until its completion or they are disqualified.

13. The City will give the following promotive examinations according to the schedule and stipulations set forth herein:

(a) Fire Lieutenant (H–20), no later than December 31, 1988. The entry level firefighters hired pursuant to the Court's order during 1987 may take this examination.

(b) Battalion Chief (H–40), no later than December 31, 1988. This examination shall be given no sooner than six months following the promotion of any Black lieutenant whose immediate appointment to the position of fire captain is required by Paragraph 11. The City agrees that absent approval by counsel for plaintiff-intervenors of a larger number, no more than five promotions to the position of battalion chief will be made during each twelve-month period from the eligibility list established as a result of this examination. The City will give counsel for plaintiffs and plaintiff-intervenors 15 days advance notice of each appointment to be made from that list. Furthermore, notwithstanding the provisions of Paragraph 14, this list may be extended with Court approval if necessary to effectuate the purposes of this Decree while allowing the SFFD to fill vacancies in the position of battalion chief.

(c) Fire Captain (H–30), no later than December 31, 1989.

(d) Fire Lieutenant (H–20), no later than December 31, 1990. However, this examination shall be given no sooner than 10 months after the graduation from the Fire College of at least 90 firefighters hired pursuant to Paragraph 9 of this Decree.

(e) Battalion Chief (H–40), no later than December 31, 1990. However, this examination shall be given no sooner than twelve months following adoption of a list of eligibles from the 1989 examination for fire captain. Furthermore, this examination shall not be given without Court approval until such time as there are at least 10 Blacks holding the permanent rank of captain or above.

(f) Fire Captain (H–30), no later than December 31, 1991. However, this examination shall be given no sooner than twelve months following adoption of a list of eligibles from the the 1990 examination for fire lieutenant.

(g) Fire Lieutenant (H–20), no later than December 31, 1992. However, this examination shall be given no sooner than 10 months after the graduation from the Fire College of at least 180 firefighters hired pursuant to Paragraph 9 of this Decree.

(h) Battalion Chief (H–40), no later than December 31, 1992. However, this examination shall be given no sooner than twelve months following adoption of a list of eligibles from the 1991 examination for fire captain.

(i) Fire Captain (H–30), no later than December 31, 1993. However, this examination shall be given no sooner than twelve months following adoption of a list of eligibles from the 1992 examination for fire lieutenant.

(j) Fire Lieutenant (H–20), no later than December 31, 1994. However, this examination shall be given no sooner than 10 months after the graduation from the Fire College of at least 270 firefighters hired pursuant to Paragraph 9 of this Decree.

14. The purpose of the preceding schedule for promotional examinations is to maximize the opportunity for advancement and promotion of all members of the San Francisco Fire Department, particularly minority persons and women. Notwithstanding the provisions of San Francisco City Charter Section 8.330, all eligibility lists created as a result of the examination schedule set forth in Paragraph 13 shall expire two years following their creation, unless the Court, upon application, agrees to extend

the lifetime of any such list in order to effectuate the goals and purposes of this Decree.

15. In order to expedite the resolution of disputes concerning examinations given pursuant to this Decree, the following provisions shall supercede applicable provisions of the San Francisco City Charter:

(a) The Civil Service Commission shall retain authority to hear and decide upon candidate protests which relate to alleged irregularities in the administration of the examination itself, typographical errors, computational errors in scoring, and a listing of candidates on tentative eligible lists. All such protests must be filed within five business days of notice of the occurrence of the event giving rise to the protest. All such protests will be resolved by the staff of the Civil Service Commission within 30 days of their filing, and such decisions shall be final.

(b) An applicant may exercise only one appeal with respect to any given issue. Appeals by more than one person regarding the same issue may be consolidated for purposes of resolution.

(c) Any other protests regarding examinations given pursuant to this Decree may be filed only by the United States, Local 798, the San Francisco Black Firefighters Association or its successor, or counsel for private plaintiffs and plaintiff-intervenors. All such protests must be filed within seven business days of notice of the occurrence of the event giving rise to the protest. All such protests will be heard by a hearing officer and resolved within 60 days of the date of filing of such protest. The decision of such hearing officer shall be final.

(d) A permanent hearing officer and substitute hearing officers shall be designated by the City, subject to the Court's approval, from lists of qualified administrative law judges provided by the State of California Office of Administrative Hearings.

16. Within sixty days of the execution of this Decree by the City and counsel for plaintiffs in intervention, the Department shall promote eleven Black firefighters (in addition to those appointed pursuant to the provisions of Paragraph 11), eight Hispanic firefighters, and eight Asian and Filipino firefighters from their current positions to positions as fire lieutenants. These promotions shall be made from the lists generated as a result of the 1984 examination for the position of fire lieutenant, selecting those for promotion who scored highest on said examination.

In addition, the City may fill up to 48 existing vacancies in the rank of fire lieutenant with persons who took the 1984 H-20 examination, choosing the persons who scored highest on that examination. Consistent with the applicant pool for that examination, minorities shall comprise twenty-five percent of the persons appointed and each minority group shall receive its pro-rata share of the appointments made. If all 48 positions are filled, those appointed shall include five Blacks, five Hispanics, and two Asians and Filipinos. No person found by the Court to have violated the Civil Rights Acts of 1866, 1871, or 1964, as amended in 1972, and the State and Local Fiscal Assistance Act while employed by the SFFD shall be promoted to lieutenant pursuant to the provisions of this paragraph.

## V. TRAINING AND SUPPORT SERVICES

17. All uniformed members of SFFD shall receive training on sexual and racial harassment and human relations. The SFFD shall consult with plaintiffs and their counsel in developing the curriculum for training.

18. SFFD will insure that all male and female firefighters are assigned properly fitting uniforms, gear, and equipment, and that their living facilities will be developed to insure both personal privacy and integration into the ranks of the Department.

## VI. INDIVIDUAL CLAIMS OF DISCRIMINATION

19. All present Black uniformed employees of the San Francisco Fire Department and former employees Jerome Pittman and Anthony Horn who claim that

they have been subjected to racial harassment or other forms of racial discrimination since March 9, 1981, shall be entitled to present their claims for resolution under the system outlined below. In addition, those Black firefighters who filed charges of discrimination with respect to the 1978 lieutenant's examination and who allege that they have suffered racial harassment as a result of filing such complaints shall be entitled to utilize this procedure to resolve such charges of racial harassment. However, no claim relating to discrimination in the development or administration of a promotional exam may be heard pursuant to this procedure.

(a) All claims to be resolved pursuant to this section must be submitted to the City Attorney within 60 days of the entry of the order approving this Decree. Claims must be submitted on forms to be developed by the City and plaintiff-intervenors.

(b) Claims shall be heard by the Court or by a Special Master appointed by the Court.

(c) All claims shall be heard and resolved within nine months of the entry of the order approving this Decree.

(d) Three weeks prior to any hearing scheduled to resolve a claim pursuant to this section the claimant shall serve upon the City a brief statement including a summary of the alleged transactions underlying the claim and the name of each witness who will testify and a summary of his or her expected testimony.

(e) Two weeks prior to the hearing scheduled to resolve a claim submitted pursuant to this section, the City shall serve upon claimant a brief statement including a summary of the facts underlying the defense to the claim and the name and expected testimony of each witness to be presented at the hearing.

(f) At any time prior to a decision made regarding each claim, the parties may agree to a final and binding settlement of that claim.

(g) The parties shall cooperate in informal and formal discovery efforts to prepare for the hearing of each claim.

(h) The hearings will be conducted and shall conform to the Federal Rules of Evidence, except that the parties may introduce in evidence written affidavits, medical records, property repair estimates, and Fire Department reports, all subject to objections based upon the authenticity of said documents.

(i) All decisions regarding standing, liability, and remedies, including attorney's fees and costs, shall be made and rendered pursuant to Title VII of the Civil Rights Act of 1964, as amended in 1972, the Civil Rights Acts of 1866 and 1871, the State and Local Fiscal Assistance Act, the Federal Rules of Civil Procedure, and Title 28, United States Code, and relevant case law.

(j) Nothing contained herein shall limit the post-trial and appellate remedies available to the claimant and the City in the event of an adverse decision by the Court or the Special Master.

## VII. RESOLUTION OF DISPUTES

20. The Fire Department shall establish and maintain throughout the life of this Decree an informal mediation process under the direction of the Department's Director of Human Relations to informally resolve complaints or problems concerning discrimination or harassment. Participation in this mediation process shall be voluntary and shall not foreclose resort to any other procedure available for making and resolving complaints of discrimination and harassment.

21. The Fire Department shall maintain a General Order forbidding discrimination and harassment. A copy of that order and the procedures for its enforcement is attached hereto as Exhibit "B."

## VIII. MONITOR

22. The Court shall appoint a Monitor to act as a Special Master under F.R.C.P. Rule 53 to insure compliance with this Decree.

23. The Monitor shall meet at least bimonthly with the parties to review progress made in the implementation of

this Decree and to resolve disputes arising under it.

24. The Monitor shall have the following powers:

(a) To interview any officer or member of the San Francisco Fire Department;

(b) To inspect and review all records and documents maintained by the Department relevant to the implementation of this Decree;

(c) To visit and observe the activities at any Department facility when necessary to carry out the functions of his or her position;

(d) To resolve, subject to review by the Court, all disputes, including disputes concerning the qualifications of persons designated by the SFFD to carry out its obligations under this Decree, which may arise among the parties concerning the implementation of this Decree.

25. The Monitor shall report to the Court semi-annually the progress being made by the defendants in implementing the terms of this Decree. Said report shall be served on all parties to the action.

26. The Monitor shall hear appeals from all decisions made by the Chief of the Department on complaints of harassment or discrimination. The Monitor's decisions with respect to said complaints may be appealed to the Court.

## IX. DUTY OF COOPERATION

27. The City agrees to meet with counsel for the other parties at least bi-monthly throughout the life of this Decree in good faith efforts to insure compliance with the terms of this Decree and to develop such programs and procedures, including recruitment plans and test development, as are required by it. The City shall provide the funding and resources required to carry out its obligations under this Decree. The City agrees to interpret this Decree according to its letter to the Court of November 12, 1987, which is attached hereto and incorporated herein as Exhibit C.

## X. DURATION OF THE DECREE

28. This Consent Decree shall remain in effect for seven years from the date of the Court's order approving it. However, the Court may on its own motion or motion of a signatory modify or extend the duration of this Decree for up to three years if necessary to effectuate the goals and policies underlying it.

## XI. NOTICE AND OBJECTIONS

29. Within the time ordered by the Court, the City shall give notice of this Decree to the classes represented by plaintiffs and plaintiff-intervenors in the form required by the Court.

## XII. ATTORNEYS' FEES AND COSTS

30. The issue of the costs and attorneys' fees due to counsel for the parties to this action shall be heard and resolved by the Court or a Magistrate or Special Master appointed by the Court for that purpose.

The parties whose signatures appear below reqauest the Court to issue its Order approving and requiring the foregoing provisions.

DATED: November 12, 1987.

/s/ Louise H. Renne
LOUISE H. RENNE, City Attorney
Attorneys for Defendants
City and County of San
Francisco, *et al.*

/s/ Eva Jefferson Paterson
EVA JEFFERSON PATERSON
Attorney for Plaintiff–
Intervenors

/s/ Dan Siegel
DAN SIEGEL
Chief of Complex Litigation
Attorneys for Defendants
City and County of San
Francisco, *et al.*

/s/ William C. McNeill, III·
WILLIAM C. McNEILL, III
Attorney for Plaintiff–
Intervenors

/s/ Shauna I. Marshall
SHAUNA I. MARSHALL
Attorney for Plaintiff–
Intervenors

/s/ Russell Galloway
RUSSELL GALLOWAY
Attorney for Plaintiff–
Intervenors

/s/ Edwin M. Lee
EDWIN M. LEE
Attorney for Plaintiff–
Intervenors

SO ORDERED.

/s/ Denise M. Hulett
DENISE M. HULETT
Attorney for Plaintiff–
Intervenors

/s/ Mary Dunlap
MARY DUNLAP
Attorney for Plaintiff–
Intervenors

DUANE W. RENO
Attorneys for Defendant–
Intervenor Local 798

/s/ Marilyn Hall Patel
United States District Judge

## EXHIBIT A

1. Defendants are permanently enjoined from engaging in any act or practice that has the purpose or effect of unlawfully discriminating against any employee of, or any applicant for employment with, the San Francisco Fire Department because of such individual's race, sex, or national origin, and specifically from unlawfully discriminating at any time on the basis of race, sex, or national origin in hiring, promotion, upgrading, training, assignment, discharge, compensation, and terms and conditions or privileges of employment. Defendants shall take reasonable steps to assure that no member of the San Francisco Fire Department retaliates against any person because that person has opposed discriminatory policies or practices or because of that person's participation in or cooperation with the initiation, investigation or litigation of any charge of unlawful discrimination based on race, sex, or national origin, or the administration of this order.

2. The defendants shall not use any selection procedure that has an adverse impact on blacks, Hispanics, Asians, or women in hiring or promotion unless the procedure can be shown to be valid or otherwise justified by business necessity, all in accordance with Title VII and the provisions of the *Uniform Guidelines on Employee Selection Procedures*, 28 C.F.R. 50.14, or successor guidelines.

3. Defendants shall maintain and adequately fund a program of recruitment and training directed at increasing the number of qualified Black, Hispanic, Asian, and female applicants for firefighter positions. Recruitment resources shall be allocated to insure that the Department's hiring goals as to each underrepresented group are met. This recruitment program shall be headed by a designated recruitment coordinator and shall include, but need not be limited to:

(a) the use of media, including media specifically targeted to Asian, Black, and Hispanic communities and women;

(b) developing and maintaining contacts with Black, Hispanic, Asian, and women's community organizations to inform their respective memberships and constituencies of employment opportunities;

(c) active use of Black, Hispanic, Asian, and female uniformed personnel in recruitment activities; at least two individuals from each group shall be designated well in advance of required recruitment efforts, given adequate training, and be provided with sufficient support to carry out these duties;

(d) training programs and such other efforts as are necessary and appropriate to advise Blacks, Hispanics, Asians, and women of employment opportunities as firefighters; and

(e) training and retention programs that will assist Blacks, Hispanics, Asians, and

women to obtain the necessary kills to qualify for firefighter positions.

5. Defendants shall make no appointments to the position of H2 firefighter until this order has been fully complied with or leave of court is obtained pursuant to the terms set forth in paragraphs 15 through 20 below.

6. Defendants shall not adopt any eligibility list nor make any appointments on an acting, provisional or permanent basis to the ranks of fire inspector (H4) or fire lieutenant (H20) which are based in any way on the selection procedures developed and administered pursuant to the 1984 job announcement for those ranks.

8. Defendants shall develop selection procedures for the entry and promotional classifications within the SFFD which are consistent with Title VII and the *Uniform Guidelines,* and shall establish new entry-level firefighters and promotional eligibility lists based upon those procedures.

9. The City shall develop new selection procedures for the ranks of firefighter (H2), fire inspector (H4), and fire lieutenant (H20) which shall be job-related and comport with Title VII and the *Uniform Guidelines.* The City shall complete development and administration of the H2, H4, and H20 examinations as soon as possible, with development of the examinations by December 31, 1987, and with administration of the examinations no later than March 31, 1988.

12. Commencing within ninety (90) days of the date that this order is entered and semi-annually thereafter, the defendants shall file with the court, the United States, and counsel for plaintiff-intervenors a report disclosing the following information:

(a) current firefighter eligibility lists showing the race, sex, and national origin of the candidates; a list of all pending entry level appointments at least 10 days prior to notification of the appointees;

(b) summary information showing by race, sex, and national origin, the numbers of applicants who applied for, took, and passed each component of the selection process administered during that reporting period;

(c) a listing of all uniformed Fire Department employees arranged by job title, race, sex, and national origin;

(d) a listing of all appointments (both initial and promotional) in uniformed positions made during the reporting period arranged by job title, race, sex, and national origin;

(e) a listing by name, race, sex, national origin, and job title of all persons terminated from a uniformed position with the Fire Department, noting the reason for that person's termination; and

(f) a listing by name, race, sex, national origin, and job title of all persons who voluntarily resigned from a uniformed position with the Fire Department, noting, if known, the reason for that person's resignation.

Each semi-annual report shall be accurate as of the first day of July and January of each year and shall be filed with the court, the United States and counsel for plaintiff-intervenors no later than August 1 and February 1 respectively. In addition, defendants shall furnish written reports to the United States and counsel for plaintiff-intervenors on matters pertaining to compliance with the order, upon written request.

13. During the time period that this order is in effect, the defendants shall retain all records relating to the recruitment, selection, appointment, promotion, training, evaluation, assignment, and discipline of persons for uniformed positions in the Fire Department, including:

(a) all applications, including applications for hire, transfer or promotion identified by race, sex, and national origin;

(b) examinations, evaluations or records of any nature showing the performance of firefighters on the job or at the training academy;

(c) all written communications between the defendants and applicants for employment, transfer, and promotion;

(d) all records relating to the implementation of the recruitment obligations of this

order including a list of all organizations and/or schools that were contacted for recruitment purposes, showing the date and nature of the contact; and

(e) all records relating to the adverse impact and/or validity of selection procedures utilized to fill entry-level or above entry-level firefighter vacancies.

The United States and counsel for plaintiff-intervenors shall have the right to inspect and/or copy for their use in connection with enforcement of this order any or all of the records described above, upon reasonable notice to the defendants. The United States and counsel for plaintiff-intervenors may request inspection or copying of other records for good cause shown upon application to the court.

14. This order shall continue in full force and effect for a period of seven years. At any time after such seven-year period, defendants may, upon forty-five (45) days notice to the United States and plaintiff-intervenors, file an order of dismissal with the court, which shall be entered unless the United States or plaintiff-intervenors, upon motion served and filed before the proposed date of entry of the order of dismissal, and after a hearing by the court, shows good cause for continuations of this order in whole or in part. During the effective period of this order, the court shall have continuing jurisdiction for the purpose of effectuating its purposes and terms, and providing for its enforcement.

### APPENDIX B

Dan Siegel
Chief of Complex Litigation
(415) 554-4229

November 12, 1987

Honorable Marilyn Hall Patel
Judge, U.S. District Court
450 Golden Gate Avenue
Courtroom 5
San Francisco, CA 94102

Re: <u>U.S.A. et al. v. CCSF et al.</u>
U.S.D.C. Nos. C84–7089/C84–1100
MHP Consolidated

Dear Judge Patel:

This letter is written to clarify the City's interpretation of and obligations under certain sections of the Consent Decree. It should be considered as part of the Consent Decree in the event that disputes later arise as to its interpretation.

First, the City will utilize its best efforts to insure its compliance with all terms of the Decree. It undertakes its obligations in good faith and with an enthusiastic commitment to the goals and purposes of the Decree.

Second, it is important to understand the assumptions and intentions of the parties with respect to promotions to the position of battalion chief and tests for that position under Paragraph 13, subparagraphs (b) and (e) of the Consent Decree. The City's assumption is that there will be 49 retirements from positions of battalion chief and above during the period 1988 through 1994. This means that there will be an average of seven vacancies each year. Under subparagraph 13(b), the City has obligated itself to make no more than five appointments each year for the two years during which the eligibility list developed as a result of the 1988 examination for battalion chief is in effect. The purpose of making this commitment is to insure that promotional opportunities exist when the battalion chief examination scheduled for 1990 is given. The parties assume that at the time of the 1990 battalion chief examination, there will be a substantial number of Black captains eligible to take that examination. The City has agreed that absent Court approval it will not give that examination until there are 10 Blacks holding the permanent rank of captain or above. The City agrees that should there be fewer vacancies in the chiefs' ranks than it assumes, the plaintiffs in intervention should be allowed to seek further relief in order to insure that there are vacancies for which Black captains may realistically compete during the lifetime of this Decree. The City is also concerned about this provision in that vacancies may arise sooner and in greater numbers than anticipated. With a limitation of only five appointments yearly in the first two years, and a restriction in giving a second battal-

ion chief's examination until there have been a total of at least 10 Blacks appointed to positions as captain or above, the Department could find itself with a great number of unfilled vacancies despite having complied with the Decree in all respects. In that event the City would return to Court to request relief, either in the form of allowing additional appointments from the list generated by the 1988 battalion chief's examination or in proceeding with the 1990 examination with a smaller number of Black captains than anticipated in the Decree. The City has advised the Court and counsel that it will seek to utilize the latter option only in the event that there are at least seven Blacks holding the permanent rank of captain or above.

The City also agrees that when it is required to utilize existing captains to fill temporary appointments to the position of battalion chief, it will select those captains on the basis of seniority, current assignments, qualifications, and affirmative action considerations. This process will allow minority captains to gain experience as battalion chiefs.

Third, the following procedure will be used to insure that no persons guilty of civil rights violations are promoted to lieutenant pursuant to Paragraph 16. The list of proposed appointees will be submitted under seal to the Monitor, who will investigate the backgrounds of the persons to be appointed. The Monitor will insure that confidentiality is protected, although she may discuss proposed appointees with the Department, counsel signatories to the Decree, and witnesses to alleged civil rights violations. In the event that objections are raised with respect to any appointee, the facts giving rise to such objections must be submitted to the Monitor under penalty of perjury after being screened by counsel for plaintiff-intervenors. The City's position is that the Monitor should reject any challenges which are not reflected in existing complaints or in materials developed in preparation for this litigation. However, the Court has agreed with plaintiff-intervenors that all challenges should be considered and that frivolous complaints should be rejected. The Monitor shall make recommendations concerning any disqualifications to the Court. Any person whose appointment is challenged under this proceeding shall be given notice by the Monitor and shall be allowed to present evidence refuting the challenge to the Monitor. The Court may receive written and oral evidence with respect to such challenges and shall make a final ruling on the matter. All appointments to lieutenant under Paragraph 16 will be made simultaneously following the resolution of all challenges.

Fourth, the City has agreed that in appointing Black firefighters to the position of lieutenant pursuant to Paragraph 16 of the Decree, it will give particular consideration to those Black firefighters who took the 1978 examination for Fire Lieutenant. One attorney designated by counsel for plaintiffs and plaintiff-intervenors will participate in the process of selecting the Black firefighters to be promoted pursuant to this paragraph.

Fifth, the City will investigate a challenge to the *bona fides* of an existing fire lieutenant's claim to be of Asian ancestry. In the event that this individual is found not to be an Asian pursuant to EEOC guidelines, an additional Asian firefighter will be promoted to lieutenant under Paragraph 16 of the Decree.

Sixth, it is agreed that Clydelho Frommoethelydo is considered to be Black for purposes of allowing him to present a claim of discrimination under Paragraph 19 of the Decree. It is understood that the doctrine of continuing violation applies to the individual claims of discrimination.

Seventh, within twelve months of the execution of this Decree, the parties will meet and discuss the feasibility of conducting a needs assessment study to determine locations and positions in the SFFD where designated bilingual positions would serve the purpose of increasing public safety.

Very truly yours,
LOUISE H. RENNE
City Attorney

/s/ Dan Siegel
DAN SIEGEL
Chief of Complex
Litigation